In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3153

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.
HUEY WHITLEY,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 CR 30066--Jeanne E. Scott, Judge.

Argued JANUARY 16, 2001--Decided April 30,
2001

   Before FLAUM, Chief Judge, POSNER and
COFFEY, Circuit Judges.

   COFFEY, Circuit Judge.  On June 30, 1999,
law enforcement officers in Springfield,
Illinois, obtained a warrant to search a
motel room occupied by the Defendant-
Appellant Huey Whitley. At the time of
the execution of the warrant, the
officers discovered cocaine and other
drug paraphernalia demonstrating that
Whitley and his companion, Marcellus
Mitchum, were engaged in the transfer
and/or sale of cocaine and cocaine base.
However, the sworn affidavit used by
officers to obtain the search warrant
contained materially false information.
Additional evidence of drug related
crimes was discovered in a simultaneous
warrantless search of the adjoining motel
room occupied by Mitchum.

   On August 6, 1999, Whitley and Mitchum
were indicted as co-defendants with one
count charging possession of a controlled
substance (cocaine and cocaine base) with
intent to distribute./1 Both defendants
filed separate motions to suppress all
evidence obtained during the searches of
their respective rooms at the Stevenson

Inn. The district court held separate evidentiary hearings on each defendant's motion, Whitley's on November 5 and 22, 1999, and Mitchum's on December 28 and 29, 1999. Whitley's motion was based on the rule of Franks v. Delaware, 438 U.S. 154 (1978), under which evidence seized pursuant to a search warrant may be suppressed if the defendant demonstrates by a preponderance of the evidence that (1) the warrant was based upon false information in the supporting affidavit, and (2) the affiant either knew the information was false or included it with reckless disregard for the truth.

The district court denied Whitley's motion to suppress, and Whitley appeals. We disagree with the trial court's ruling and reverse the court's determination that the false statements contained in the warrant affidavit were neither included intentionally nor with reckless disregard for the truth. We further order the false information stricken from the affidavit and remand the case for a determination as to whether the remaining allegations and information contained in the affidavit are sufficient to establish probable cause for issuance of the search warrant.

BACKGROUND

A.   Obtaining the Search Warrant for Room 422 at the Stevenson Inn.

On June 30, 1999, Whitley and Mitchum were staying in rooms 421 and 422 at the Stevenson Inn Motel in Springfield, Illinois.  Local and federal law enforcement officers were investigating the two men for allegedly participating in the sale of cocaine./2 A confidential informant working with the law enforcement officers visited Whitley at the motel shortly after his arrival, and subsequently reported to the officers her belief that Whitley and Mitchum had transported a large quantity of cocaine and cocaine base into the city for sale and distribution. Following the informant's report, FBI Special Agent Steven Bennett and FBI Special Federal Officer Stephen Welsh/3 took the informant to Springfield Police headquarters to secure a warrant to search Whitley's motel room, identified by the informant as Room 422 at the Stevenson Inn Motel. Meanwhile,

Springfield Police officers Paul Carpenter and Stephen Peters took up positions outside the motel and kept the building under surveillance. In the course of their surveillance the officers observed a woman, later identified as Latisha Benton, enter Whitley's motel room, stay for a period of time, and shortly thereafter depart in her van. When Benton failed to properly signal for a turn when leaving the motel, Peters notified uniformed support officers and requested a traffic stop. Benton's car was pulled over by Springfield Police Officer Jeffrey Bivens. Officer Bivens spoke with Benton and during the conversation obtained her consent to search. While executing the search, Bivens discovered twenty-two individually wrapped bags of marijuana in Benton's purse. Shortly after this discovery was made, Officers Carpenter and Peters arrived at the scene. Benton was questioned by Carpenter about the connection, if any, between the marijuana in her purse and her visit to Whitley's room at the Stevenson Inn. Benton made it very clear to Carpenter that she had not obtained the marijuana from anyone at the Stevenson Inn, and furthermore that she had the marijuana in her possession prior to her arrival at the motel.

   Exactly what happened next is the subject of a great amount of confusion. This much is clear: One of the officers present at the scene of Benton's vehicle stop communicated with either Agent Bennett or Detective Welsh, who were at police headquarters preparing the documents necessary for the issuance of the search warrant for Whitley's motel room. Welsh and Bennett claim to have been informed by someone that Benton had received the marijuana from Whitley at the Stevenson Inn. Obviously, this information was exactly the opposite of the statement Benton made to Officer Carpenter only minutes before--that she had the marijuana in her possession before arriving at the motel.

   At the hearing on Whitley's motion to suppress, none of the officers involved/4 admitted to a clear recollection of who told what to whom concerning the source of Benton's marijuana. Officer Bivens recalled relaying some information to Agent Bennett and Detective Welsh from the

scene of the traffic stop, but he emphatically denied conveying any information regarding the source of Benton's marijuana. Carpenter recalled discussing with Peters the content of his interview with Benton, and he also remembered stating to Peters that it would have been helpful to the investigation if Benton had received the marijuana from Whitley. Carpenter was certain, however, that he did not relay the content of Benton's statements to either Welsh or Bennett. Peters was also certain that he never spoke with either Welsh or Bennett regarding any of the information he received at the scene of Benton's traffic stop.

At Whitley's suppression hearing, Agent Bennett was able to recall very little about the source of the false information other than that he and Welsh were informed by someone at the scene that Benton had received the marijuana from Whitley at the Stevenson Inn. He testified that the information came from a radio or cellular phone communication emanating from either Bivens or Carpenter. Agent Bennett was unable to recall whether the phone or radio call was directed to himself or Detective Welsh, or even which of the two actually heard the fictitious information first.

Detective Welsh also had very little recollection regarding the specifics of the communications received from the scene of Benton's traffic stop. He could not recall which officer was relaying information from the scene, or whether it was Bennett or himself who received the calls. Welsh's testimony on this point contradicted the information set forth in his sworn warrant affidavit, which positively identified Carpenter as the source of the information concerning Benton's marijuana.

At Whitley's suppression hearing, Agent Bennett testified that when the confidential informant learned that the information falsely attributed to Benton was going to be incorporated into the warrant affidavit, the informant reacted with surprise at the idea that marijuana was being sold from Whitley's motel room. The record discloses that the informant had no reason to believe that Whitley and Mitchum were involved with the sale of any controlled substance other than

cocaine.

Despite the officers' professed lack of recollection regarding the identity of the officer communicating information concerning the source of Benton's marijuana, and the exact content of those communications, there is no question that Detective Welsh prepared and signed an affidavit reading in part as follows:

I was advised by Officer Paul Carpenter that a black female named Latisha Benton was stopped for a traffic violation in the area of Taylor & Ash Streets, Springfield, Sangamon County, Illinois. That pursuant to the stop, officers learned about and found approximately 22 small, Ziploc-type plastic baggies, commonly known on the street as dime-size baggies, containing green leafy substance that field-tested positive for the presence of THC, indicating the substance to be cannabis. That Burton [sic] told officers at the stop that she got the cannabis from a room at the hotel on Stevenson Drive from a male known to her as "Q."/5

There is no dispute in this case that the final sentence in the above-quoted section of Detective Welsh's affidavit is untrue. There is also no dispute that the Sangamon County Circuit Court issued a search warrant for Whitley's motel room (Room 422) based at least in part on the false information contained in Detective Welsh's affidavit.

The search warrant was issued at approximately 8:15 a.m. on June 30, 1999. Officers promptly returned to the motel and spoke with the motel manager, who informed them that Whitley had rented not only Room 422, but also Room 421./6 Faced with a situation in which they possessed a search warrant for one, but not both, of the rooms Whitley rented, officers decided that they would knock on the door to Room 421 and attempt to gain entry by obtaining the consent of whomever answered the door. Once officers had gained entry into Room 421 and believed that there was no threat to their safety, other officers would then serve the search warrant on Room 422.

The officers proceeded according to this plan of entry, and the ensuing search of both rooms turned up evidence that

Whitley and Mitchum were involved in the sale of cocaine and cocaine base. In view of the fact that they had a search warrant in hand, the officers' actual entry into and search of Whitley's room (Room 422) is not an issue in this appeal. However, the officers' testimony regarding the means by which they gained entry into Room 421 (Mitchum's room), the premises for which no search warrant had been issued, is pertinent to Whitley's appeal.

B. The Officers' Warrantless Entry into Room 421.

At Mitchum's suppression hearing,/7 Detective Welsh and Springfield Police Detective George Bonnett testified that at approximately 9:15 a.m., on June 30, 1999, they knocked on the door to Room 421, that Mitchum opened the door, gave the officers permission to enter, and consented to a search of the room. When questioned by Mitchum's defense counsel, these officers specifically denied ever using a key card to open the door to Room 421./8

Mitchum's testimony at his suppression hearing contradicted that of officers Welsh and Bonnett. Mitchum stated that he was asleep when there was a knock at the door, someone announced "room service," and before he could get out of bed the officers opened the door and walked into his room. Contrary to Detective Welsh's testimony, Mitchum specifically denied ever giving the officers permission to enter the room or to perform a search. He categorically denied that officers even requested permission to conduct a search of the room.

After Detectives Welsh and Bonnett had testified that no key card had been used to gain entry into room 421, but before the conclusion of Mitchum's suppression hearing, prosecutors went to the Stevenson Inn to question motel employees. Defense counsel's questioning of Detectives Welsh and Bonnett concerning the possible use of a magnetic key card to open the door to Room 421 had alerted the prosecution to the fact that this would probably be a continuing issue at Mitchum's suppression hearing. At the motel, prosecutors learned that an employee specifically recalled making

duplicate key cards for the officers for both Rooms 421 and 422 on the day in question. They were also informed that each electronic door lock at the motel has a memory device, and that the memory can be accessed to display the date and time that a key card was inserted into the door lock. The memory for Room 421 demonstrated that a key card had been inserted and removed from the lock at 9:16 a.m. on June 30, 1999--the very time that officers testified they were obtaining entry into Room 421./9 Despite the direct conflict between this evidence and the testimony of the officers, the prosecution presented this evidence to the district court at the continuation of Mitchum's suppression hearing the next day.

C. The District Court's Decision.

As noted above, both Whitley and Mitchum filed separate motions to suppress the evidence and statements obtained during the searches of Rooms 422 (Whitley) and 421 (Mitchum). Whitley's motion was heard and decided first. Whitley premised his motion on the false statements concerning the source of Latisha Benton's marijuana that were contained in Detective Welsh's affidavit, arguing that the false statements were included knowingly, intentionally, or with reckless disregard for the truth. See Franks v. Delaware, 438 U.S. 154 (1978). After hearing the officers' testimony, the district court ruled that Whitley had failed to meet his burden of demonstrating that Detective Welsh included the false information recklessly or intentionally. The court held that Detective Welsh's inclusion of the false statements may have been the result of careless or negligent behavior, but that there was insufficient evidence on which to base a conclusion that Detective Welsh, or any other officer involved, intentionally lied or acted recklessly.

Two weeks after the denial of Whitley's motion, the court proceeded with Mitchum's motion to suppress. It was at this hearing that the officers' credibility was called into more serious question over the issue of the key card used to gain entry into Room 421. Mitchum's motion to suppress was granted on the grounds that the court did not

find the testimony of Detectives Welsh and Bonnett to be credible regarding the means of entry into Mitchum's room. The government subsequently dismissed all charges against Mitchum.

After the granting of Mitchum's motion, Whitley filed a motion asking the court to reconsider its prior denial of his motion to suppress. In his motion for reconsideration, Whitley argued that the officers' very questionable testimony regarding the facts surrounding their entry into Mitchum's room cast a dark shadow on the credibility of Detective Welsh's testimony regarding the inclusion of false information in his affidavit. The district court declined to reconsider its prior ruling, holding that "Welsh's testimony regarding the circumstances surrounding the preparation of the affidavit corroborated that from other officers who were not involved in the entry into Mitchum's room."

Whitley subsequently entered a contingent guilty plea and was sentenced to 176 months imprisonment, while reserving his right to pursue this appeal from the adverse rulings on his motion to suppress.

DISCUSSION

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court defined the procedure, evidentiary burdens, and proper remedies associated with a defendant's attack on the truthfulness of statements made in a sworn affidavit supporting the issuance of a search warrant. The Fourth Amendment requires the trial court to conduct an evidentiary hearing upon a defendant's preliminary showing that: (1) the warrant affidavit contained false information; (2) the false information was included in the affidavit intentionally or with reckless disregard for the truth; and (3) that the misrepresentations were necessary to the determination of probable cause to issue the warrant. Franks, 438 U.S. at 155-56.

If a defendant makes this initial showing and a hearing has been granted, as it was in this case, Franks goes on to discuss the particularities of the inquiry to be made at the hearing:

In the event that at that hearing the

allegation of perjury or reckless disregard is established by thedefendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Franks, 438 U.S. at 156.

Under this standard there are two levels of inquiry that must be made in assessing the evidence presented at a Franks hearing. Initially, the court must determine whether the defendant has demonstrated that the false information was included intentionally or recklessly. If not, the inquiry is at an end and the fruits of the search should not be suppressed. However, should the defendant meet his burden of establishing that false information in the affidavit was included as the result of intentional deceit or reckless disregard, the court must expand its inquiry and determine whether the affidavit, when stricken of its falsity, is nonetheless sufficient to establish probable cause for issuance of the search warrant. In the present case, the court ruled against Whitley on the question of intentional deceit or reckless disregard for the truth, and accordingly did not reach the second issue.

The Franks decision did not define "reckless disregard for the truth," other than to suggest that the standard required more than mere negligence on the part of the affiant. Franks, 438 U.S. at 171. In United States v. Williams, 737 F.2d 594 (7th Cir. 1984), we defined the concept of "reckless disregard for the truth," as used in the context of a Franks hearing, as follows:

[T]o prove reckless disregard for the truth, the defendants had to prove that the affiant 'in fact entertained serious doubts as to the truth of his allegations.' Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations.

Id. at 602 (citations omitted).

Subsequent decisions have slightly expanded the Franks principle to include the state of mind not only of the affiant, but also of those governmental agents from whom the affiant received false information incorporated into the affidavit. In other words, the validity of the search is not saved if the governmental officer swearing to the affidavit has incorporated an intentional or reckless falsehood told to him by another governmental agent. United States v. Pritchard, 745 F.2d 1112, 1118 (7th Cir. 1984); United States v. McAllister, 18 F.3d 1412, 1417 (7th Cir. 1994).

In the context of the denial of a Franks motion following an evidentiary hearing, we review the court's decision for clear error. Williams, 737 F.2d at 602. Under this standard, we will reverse the district court's decision only if, after reviewing the record as a whole, we are of "the definite and firm conviction that a mistake has been committed." McAllister, 18 F.3d at 1416; United States v. Soria, 965 F.2d 436, 439 (7th Cir. 1992). Several factors lead us to conclude that a serious mistake was made in this case.

Our task is to gauge Detective Welsh's culpability for including the false information in his affidavit. At the outset, this obligation is hampered by the officers' collective lack of recollection regarding almost all aspects of the pertinent communications. Not a single officer present at the scene of Benton's traffic stop admits to telling Welsh and Bennett anything concerning the source of the marijuana, whether accurate or inaccurate. Because no one remembers who specifically said what to whom, we are left with a big black hole, and no starting point from which to assess Detective Welsh's state of mind. The collective testimony of the officers involved does not permit us to conclude that Welsh misheard the communicating officer, that the communicating officer misspoke, that the communicating officer was confused about the content of Benton's statement, or whether the erroneous information was ever transmitted from the scene at all. We are left only with Detective Welsh's statement that he knows he heard the

information from somebody. Needless to say, it is difficult to assess the facial veracity of a statement that no one admits to making. Indeed, it is difficult to label the officers' conduct as mere negligence when the record is barren of any evidence that might explain the nature of and reasons for the breakdown in communication and by whom it was initiated. The blame for the absence of this important information lies with the government's witnesses and their inability to provide direct, clear and convincing testimony concerning a most crucial event.

We know that Welsh's affidavit states that he heard the false information from Officer Carpenter. Welsh executed the affidavit immediately after he allegedly obtained the false information, so we must presume that the source of the information was relatively fresh in his mind at the time the affidavit was prepared. However, Officer Carpenter denies being the source of the false information. At the suppression hearings, Welsh backtracked from his affidavit's identification of Carpenter as the source, and instead claimed that he simply could not remember who told him about the connection between Whitley and the twenty-two bags of marijuana found in Benton's purse. Welsh's decision to identify Carpenter as the source of the false information, if in fact he did not know from whom he received the information, certainly raises a red flag with respect to his credibility on crucial events.

Even if we assume for the moment that the communicating officer at the scene incorrectly identified Whitley as the source of Benton's marijuana, there was still good reason for Welsh to harbor some serious questions concerning the accuracy of this information. Whitley and Mitchum were being investigated for the possible sale of cocaine and crack, not marijuana. The confidential informant believed the two men to be involved with the sale of cocaine and crack, and she expressed surprise at the notion that Whitley and Mitchum might be involved in the sale of marijuana. The false information similarly came as a surprise to Welsh and Bennett, who also had no prior information that Whitley and/or Mitchum were involved with marijuana. The

false information constituted an entirely new and independent basis for obtaining a search warrant, yet Welsh, an experienced law enforcement officer, did nothing to verify this sudden change in the direction of the investigation. He did not simply ask the communicating officer to repeat the information to make certain he heard it accurately. He did not ask to speak with Officer Carpenter (assuming that Carpenter was not the original source of the information) to obtain a firsthand account of Carpenter's interview with Benton. By the government's own admission, the false information regarding the source of Benton's marijuana became the lynchpin for a finding of probable cause to issue the search warrant./10 The fact that the Benton information did not correspond with the officers' understanding of the activities for which Whitley and Mitchum were being investigated should have at the very least raised a question in Welsh's mind as to the accuracy of the information.

Nonetheless, we might have been willing to agree with the district court's characterization of Welsh's inclusion of false information in his affidavit as merely negligent, sloppy police work were it not for the very enlightening damage done to his credibility at Mitchum's suppression hearing. It is clear that Welsh was less than truthful in his testimony regarding the means of entry into Mitchum's motel room. The district court made findings on the credibility issue as follows:

There are a lot of things that are striking about the credibility of the officers. And I don't really like this that [sic], but we've got keys that were obviously received from the motel manager to the two rooms and no reference to that in any police report.

* * *

Officer Welsh was asked yesterday if he used a key on Room 421. He expressly stated no, he did not. He was also asked whether he ever inserted a key into the lock of Room 421 and he said he did not. Officer Bonnett was asked yesterday whether he saw Officer Welsh put the computer key card into the lock at Room 421. He testified that he did not see

Officer Welsh do that. He stated that he himself did not do that and that he didn't see anyone do that. And yet we know today that somebody stuck the computer key card into the door lock of Room 421 twice in the minute of 9:16. And that is pretty unrefuted evidence from the computer that goes with the key card to the room.

\* \* \*

And so we have no explanation of how this computer key card was used in that door and that casts a lot of doubt on the credibility of the officers. And again, I don't like reaching this conclusion, but it is thrown in my face in this case that somebody is not being forthright concerning what was done with those computer key cards.

And the fact that it was initially kept from us that they even had a key card to Room 421; that there was noreport made of it; which would seem to be an important thing that should have been in a report. That the case is replete with inaccuracies, to put it mildly, causes the Court to conclude that on the issue that is before me, the Defendant [Mitchum] is more credible than the officers. And while I dislike being put in a position to suppress evidence, I don't see how I can avoid it.

Admittedly, the district court had not made this credibility determination at the time it decided Whitley's original motion to suppress evidence. However, Whitley asked the court to reconsider its earlier ruling after the completion of Mitchum's suppression hearing. In its decision denying the motion for reconsideration, the court acknowledged the questions surrounding Welsh's credibility, but did not find them determinative due to "corroborative testimony" from other officers regarding preparation of the affidavit:

The Court will not reconsider its ruling on Whitley's prior motions. Officer Welsh's testimony regarding the circumstances surrounding preparation of the affidavit corroborated that from other officers who were not involved in the entry into Mitchum's room. The facts surrounding the entry into Mitchum's room do not call into question any of those

other officers' corroborative testimony regarding the preparation of the affidavit. The motion to reconsider is denied.

This is where the district court's conclusions cross the boundary into the clearly erroneous. We are unable to iden tify the "corroborative testimony" to which the court is referring in its decision, nor has the government enlightened us as to what testimony is supposed to corroborate Welsh's version of events. Not one of the officers at the scene of Benton's traffic stop admits to supplying Welsh with any information regarding the source of Benton's marijuana. Agent Bennett recalls being aware of the erroneous information, but for reasons unexplained in the record he was unable to recall whether he received the information, whether Welsh received it, or whether he heard it from Welsh. Obviously, this recollection falls far short of corroborating Welsh's testimony that he heard the erroneous information from someone at the scene of Benton's interview. As stated above, we are left with nothing other than Welsh's question able recollection and subsequent testimony that he heard the false information "from somebody." In short, the record is barren of any evidence corroborating Welsh's testimony that he was misinformed regarding the connection between Benton's marijuana and defendant Whitley.

We refuse the government's invitation to consider the officers' credibility regarding the preparation of the affidavit in isolation, divorced from a consideration of their lack of credibility in connection with the entry into Room 421. The two events concerned the same investigation, occurred within a very short time of one another, and Detective Welsh was the primary protagonist in both incidents. Testimony regarding the two events was taken in the same prosecution.

The district court unequivocally found Detective Welsh to have given less than truthful testimony concerning aspects of his participation in the searches at issue. In our view, this credibility determination casts an entirely different light on the officers' convenient collective lack of recollection regarding

the source of the erroneous information contained in the warrant affidavit. We are compelled to conclude that the officers' lack of recollection was merely an excuse for the intentional or reckless inclusion of false information into the affidavit. Officers who have previously been exposed as being less than truthful in their testimony regarding searches incident to an investigation simply cannot expect us to accept a collective "we can't remember" as explanation for false affidavit information. Regrettably, conduct of this type by one or two officers casts a dark cloud over the thousands of dedicated law enforcement personnel working at the local, state and federal levels to protect and safeguard the rights of all citizens guaranteed in the United States Constitution. We refuse to excuse and accept questionable conduct of this nature.

In summary, we are convinced that the district court erred in concluding that Whitley failed to carry his burden of demonstrating that the false information was included in Welsh's affidavit either intentionally or with reckless disregard for the truth. The factors that lead us to this conclusion are (1) the officers' inability to identify and explain the source of the erroneous information; (2) the fact that Welsh's affidavit positively identified Officer Carpenter as the source of the false information, combined with Carpenter's testimony denying that fact and Welsh's subsequent retraction of his affidavit testimony; (3) the fact that no effort was made to verify the accuracy of information that did not comport with the officers' belief concerning the defendants' allegedly illegal activities; and (4) the unequivocal lack of credibility of Detective Welsh's testimony regarding his participation in the search of Room 421. Whether it is characterized as intentional deceit or reckless disregard, we hold that the evidence is sufficient to tip the balance in Whitley's favor on his motion for reconsideration.

This does not end the inquiry, however. Franks requires a determination as to whether the affidavit, when purged of the false information, is nonetheless sufficient to support probable cause for the issuance of a search warrant. The district court did not reach this issue.

We reverse the decision of the court that false information was not inserted into the affidavit intentionally or with reckless disregard for the truth, order the false information in Detective Welsh's affidavit stricken, and remand the case for a consideration of whether the remaining facts contained in the affidavit are sufficient to support a finding of probable cause.

/1 See 21 U.S.C. sec. 841(a)(1) and 841(b)(1)(A).

/2 The investigation was conducted by an FBI "Safe Streets Task Force" comprised of both FBI Agents and local officers from the Springfield Police Department.

/3 Welsh was a Springfield Police Department Detective assigned to the FBI Safe Streets Task Force. He is hereafter referred to as "Detective Welsh."

/4 The officers who testified at Whitley's suppression hearing were Steven Bennett, Paul Carpenter, Stephen Peters, Jeffrey Bivens, and Stephen Welsh.

/5 The confidential informant previously told officers that Whitley was also known as "Q."

/6 As it turned out, Whitley was staying in Room 422, and Mitchum was in Room 421.

/7 As previously noted, Whitley and Mitchum were co-defendants in the district court and both defendants filed separate motions seeking to suppress any evidence obtained in the searches of their respective motel rooms. Whitley's motion was decided first, before testimony was taken regarding the officer's entry into Room 421 (Mitchum's room). Whitley's motion was denied, but Mitchum's was granted, and Mitchum is not a party to this appeal. However, for a complete understanding of the facts and issues in Whitley's case it is necessary to review and understand the testimony taken at Mitchum's suppression hearing on December 28-29, 1999.

/8 At the suppression hearing, Detective Welsh testified as follows:

Q: Did you at any time use a key to either prepare to enter Room 421 or to enter Room 421?

A: No.

Q: Did you ever insert a key into the lock of Room 421?

A: No.

Q: Do you recall even having such a key with you?

A: No.

  Detective Bonnett also denied the use of a key:

Q: At any point in time before the door was opened, did anyone put a key in that door?

A: No, nobody put a key in the door.

/9 The memory for the lock on Room 422 demonstrated that a key was used in the lock of that room at approximately the same time that a key was used on the door to Room 421. At the suppression hearings, officers acknowledged using a key in the lock of Room 422 prior to entering. As previously noted, officers unequivocally denied the use of a key card in the door of Room 421.

/10 We note that the government's appellate brief states, at page 17, "Without [the] erroneous allegation, the remaining facts alleged in the affidavit would not support a finding of probable cause."