Agnes, Peter W., J.
1. The defendant is charged with Rape under G.L.c. 265, §22(b). He filed a pretrial motion to suppress evidence obtained by the Commonwealth as a result of a search warrant dated June 25, 2004 issued by this court and made returnable to the Westboro District Court. The return filed by the executing officer states that the police seized DNA samples, obtained a statement from the defendant, a quantity of pills and some photographs of women. Based on a “substantial preliminary showing” by the defendant that the application for the warrant contains a statement of fact that is false, that was made purposely or recklessly, and that is material to the question of whether there is probable cause, this court conducted an evidentiary hearing. See Franks v. Delaware, 438 U.S. 154, 155-56 (1978). See also Commonwealth. v. Blake, 413 Mass. 823, 825-26 (1992). Even in the absence of a showing of intentional or reckless conduct, evidence that an affidavit contains a material misstatement of fact is sufficient to warrant a trial judge in conducting a hearing. See Commonwealth v. Signorine, 404 Mass. 400, 439 (1989).
FINDINGS OF FACT
2. Steven Reale is a detective with the Westboro Police Department and has served as a police officer for 17 years.[1] He was on duly on May 17, 2004 at approximately 11:30 p.m. when he interviewed Maiy Smith (a pseudonym). Ms. Smith was not known to Detective Reale. She reported to him that she had been sexually assaulted a few days earlier. She stated she and a friend (later identified as the defendant Charles Atchue) had dinner at John Stone’s Inn in Ashland at about 6:00 p.m. on the night in question. Later, she went to his home in Westboro. He “insisted on” her having an “alcoholic drink” which he prepared. She accepted the drink. The next'thing she recalled was waking up in her apartment and “believing” she had been assaulted.[2] This brief interview with Ms. Smith was Detective Reale’s only contact with the alleged victim before he submitted an application to the court for a search warrant.[3]
3. During this initial interview, the alleged victim reported to him that she had no memory of actually being sexually assaulted or of a sexual act being committed against her. She also informed Detective Real that on the night in question, she had an appointment with her psychiatrist. She said they drove to the office and she went inside while the defendant waited for her in the car. When she learned her appointment had been canceled, she decided to go with the defendant for drinks. She told Detective Reale that she was taking “anti-depressants” for her problems. He did not ask her what specific medications she was taking, or *591 whether she had consumed any medication on the night of the alleged assault. Detective Reale did not ask her any questions about the condition of her clothing when she awoke the following morning. Detective Reale did not ask if she had driven her vehicle on the day or evening in question, whether she had her house keys with her the entire time, or whether there was anything unusual about the condition of her home, including her bedroom, when she awoke.
4. Before applying for the search warrant in question, Detective Reale was aware that Ms. Smith had given a statement to Sergeant Baker that same night. See exhibit 2. Sergeant Baker was designated by her department as the Rape Investigator. Detective Reale was aware of the details the alleged victim had given to Sergeant Baker, including, in particular, that the alleged victim had been prescribed Xanax. Detective Reale was not aware of how many alcoholic drinks the victim may have consumed on the night in question, or whether she had any history of alcohol or substance abuse problems. He also was not aware of and did not inquire about the amount of Xanax the alleged victim may have consumed or when she consumed it.
5. After her interview with Detective Reale, the alleged victim spoke to Detective Baker who came to the police station for this purpose. Sergeant Baker kept no notes or records of the interview. The alleged victim was nervous and upset and reported that she had been in an abusive relationship in the past.[4] She told Sergeant Baker that she went out with the defendant that evening for drinks and dinner and then she drove them to her therapy appointment in her car. Since the appointment was cancelled she and the defendant went out for more drinks. They returned to the defendant’s home in Westboro. She stated that she had no memory of leaving his home and no idea how she ended up in her home the next morning. She told Sergeant Baker that she had a prescription for “Xanax” and had taken the medication in the past. Sergeant Baker did not ask any questions about whether the alleged victim was taking Xanax on or about the day of the incident. She told Sergeant Baker that she went to the hospital for an examination before coming to the police department. The interview lasted for about one hour. Once the alleged victim reported that she believed she had been drugged and then raped, the police inquiry of her came to an end. There was no follow-up investigation of any of the factual details supplied by the alleged victim, and no inquiry made about any history of drug or alcohol use or abuse by Ms. Smith. Sergeant Baker did not ask the alleged victim if she had suffered any injuries. Sergeant Baker did not contact the Metro West Hospital. The only subsequent role played by Sergeant Baker was to serve as a member of the police team that executed the search warrant. She had no recollection of hearing the defendant receive any Miranda warnings before he was questioned at his home.
6. On May 14, 2004, prior to going to the police, Ms. Smith went to the Metro West Medical Center where a sexual assault evidence collection examination was conducted. The “rape kit" was submitted to the State Police Crime Laboratory for analysis. Detective Reale received the result of the analysis on June 22, 2004. See exhibits 3 and 6. According to the “toxicology” report, the alleged victim had “benzodiazepine” in her system (unknown concentration) and a second substance identified as “venlafaxine.” Detective Reale knew that benzodiazepine was a controlled substance, but he not know from his training and experience anything about the second drug. The “biological” analysis indicated the presence of sperm cells, but did not establish a connection between the defendant and the alleged victim.[5]
7. Detective Reale did not contact the alleged victim to ask if she had any explanation for the evidence of these two drugs in her system. He does not have any special training or experience in toxicology or pharmacology. Detective Reale did not ask the alleged victim any questions about whether she had a memory of engaging in sexual activity with anyone else at or about the times in question. He did not contact the hospital to follow up on any evidence they may have discovered or recorded.
8. In paragraph (5) of the application for a search warrant (see exhibit 5) he submitted to the Superior Court on June 25, 2004, Detective Reale states in part as follows: “On 6/22/2004 this officer was notified in writing by the State Police Crime Laboratory as to the results of the victims ‘Toxicology’ and ‘Biological’ results with the following. Blood: Benzodiazepine (Positive) which is a Schedule IV sedative and a brand name for the date rape drug ‘Rohypnol.’ Biological: Vaginal Swabs, Saliva (Positive); External Genital Swabs, Sperm Cells (Positive) .”[6] The misstatement is repeated in paragraph (7) of the affidavit.
9. The statement in paragraph (5) and (7) of Detective Reale’s application for a warrant (exhibit 5) that “Benzodiazepine” is a “brand name for the date rape drug ‘Rohypnol’ ” is false.[7] I take judicial notice of the fact that “Benzodiazepine” is a category of drugs classified by the federal Controlled Substances Act as depressants and includes medications prescribed to reduce anxiety such as Xanax, to assist people with insomnia, and also includes tranquilizers such as “Rohypnol” or “Flunitrazepam.”[8] Rohypnol is a benzodiazepine medication that is not manufactured or legally marketed in the United States and whose properties are such that it is sometimes referred to as the “date rape drug.”[9] Detective Reale was not given this information by any person, and he did not inquire of any other person about its accuracy. There was nothing to prevent Detective Reale from contacting the State Police Crime Laboratory or the Office of the District Attorney to verify the statements he made in paragraph (5) and (7) of his affidavit. Detective Reale’s *592 recollection is that he obtained the information from a book that he found in the police station. He had not used this book before in any case. I do not credit this testimony. Instead, I find that Detective Reale relied on an unknown source of unknown reliability as the basis for his statement that Benzodiazepine is a “brand name” for the “date rape drug” Rohypnol. I do not find that Detective Reale purposely included false information in his affidavit in order to bolster his case for probable cause. I find that Detective Reale acted with reckless disregard for the truth when he included that statement in paragraph (5) and (7) of his affidavit because he knew or should have known that it was highly material to a determination of probable cause and he had no reliable basis for his belief that it was true. Also, I find that Detective Reale did not purposely omit information about the fact that the alleged victim was under the care of a therapist or psychiatrist and had been prescribed and used Xanax in order to bolster his case for probable cause. However, I find that Detective Reale knew or should have known that that information was highly material to a determination of probable cause and thus acted with reckless disregard for the truth by omitting it.
10. This was Detective Reale’s first case of suspected “date rape” involving the use of a drug. Although Detective Reale received some guidance from an Assistant District Attorney, he (Detective Reale) did not ask the prosecutor to review his application before it was submitted, and in particular, did not discuss the contents of paragraph (5) and (7) with a prosecutor before the application was submitted to the court.
11. There is no statement or reference in Detective Reale’s Application for a Search Warrant (exhibit 5) that the alleged victim reported she had been prescribed medication by a therapist or that she may have been using medication on the night in question.
12. Neither Detective Reale nor Sergeant Baker knew or made any effort to discover that the drug which had been prescribed for and used by the alleged victim, namely Xanax, is a commercial or street name for a category of depressant medications known as Benzodiazepine, or that the so-called “date rape” drug, commonly known as Rohypnol, which is also a depressant medication in this class is a drug with a chemical name of Flunitrazepam. Neither Detective Reale nor Sergeant Baker knew or made any effort to discover what the effect on the human body would or could be as a result of combining Xanax and alcohol.
13. The application for a warrant filed by Detective Reale also does not make any reference to the fact that the alleged victim drove her automobile on the night in question. She not only drove to her appointment with her psychiatrist, but also drove the defendant to dinner, then to another establishment where they had drinks, and then to the defendant’s home. More significantly, however, she testified in the Grand Jury that she also drove her automobile home from the defendant’s residence. See Defendant’s Memorandum ofLaw, exhibit2, Grand Jury Minutes, pp. 15, 18, 31, 32, 34-35, 36. Detective Reale did not question her about her ability, on the one hand, to operate her motor vehicle, and her inability to recall anything after consuming a drink at the defendant’s home.
14. A search warrant issued from the Superior Court on June 25, 2004 as a result of the application by Detective Reale. The warrant was executed at 9:20 a.m. the next day by Detective Sergeant Kalagher, Detective Reale, Sergeant Baker and officer Rockwood of the Westboro Police Department. The defendant was at home when the police arrived and was allowed to view the warrant. Detective Sergeant Kalagher read the defendant the Miranda warnings. The defendant said he understood his rights and signed a written waiver form. See exhibit 7. There was an interview conducted around the defendant’s kitchen table. As a result, the defendant signed a one-page statement. See exhibit 8. The defendant was not made aware that he had been accused of drugging and raping the alleged victim, but was told simply that the police were investigating a “sexual assault.” The interview was not tape recorded.
RULINGS OF LAW
15. In Franks v. Delaware, 438 U.S. 154 (1978), the United States Supreme Court held that if after a hearing the defendant establishes, by a preponderance of the evidence, (1) that the affiant in support of an application for a search warrant committed perjury or made false statements with a reckless disregard for their truth, (2) that the statements are material to the determination of probable cause, and (3) the affidavit without those false statements is not sufficient to establish probable cause, the Fourth Amendment requires that the evidence be suppressed. See Commonwealth v. Amaral, 407 Mass. 511, 519 (1990), discussing Franks v. Delaware, supra The Franks doctrine calls for the same result if the affiant is shown to have purposely or recklessly omitted information that is material to probable cause in the sense that if it had been included the issuing magistrate would not have found probable cause. See Burke v. Town of Walpole, 405 F.3d 66, 81-82 (1st Cir. 2005); State v. Mann, 123 Wis.2d 375, 388 (1985). Compare Commonwealth v. Corriveau, 396 Mass. 319, 332 (1985).
16. There may be a variety of reasons why false information may find its way into an affidavit in support of a search warrant. One year before the decision in Franks v. Delaware, supra, the Supreme Judicial Court made this observation:
Falsity in the affidavit can come about through intention, recklessness, negligence, or innocent mistake; the false information may be indispensable to a showing of probable cause or fall short of that. The case for suppression is felt to be strongest when material false information was intentionally introduced into the affidavit by an official acting as *593 affiant. There is diminished perceived ground for suppression as the factors of the blameworthiness of the official and the importance of the information shade off; but reasoned authority exists for suppression in some situations of intentional nonma-terial, and negligent material, misstatements.
Commonwealth v. Reynolds, 374 Mass. 142, 146 (1977). Subsequent to the decision in Franks v. Delaware, supra, the Supreme Judicial Court clarified when relief in the form of suppression is mandated.
[I]n order to strike any false statements from the affidavit, the defendant has the burden of showing by a preponderance of the evidence that the statement was made “knowingly and intentionally, or with reckless disregard for the truth.” Franks v. Delaware, 438 U.S. 154, 155-56 (1978). See Commonwealth v. Nine Hundred & Ninety-two Dollars, 383 Mass. 764, 767, 769 (1981). A negligent misrepresentation by the affiant would not warrant a redaction of the false statement.
Brezezirtski v. Commonwealth, 405 Mass. 401, 407 (1989). See Commonwealth v. Honneus, 390 Mass. 136 (1993). Thus, a defendant is not entitled to relief simply because it turns out that a police officer made a mistake about some of the facts set forth in an affidavit in support of a search warrant. See Commonwealth v. Alvarez, 422 Mass. 198, 208 (1996). The Supreme Judicial Court has left open whether Article 14 of the Massachusetts Declaration of Rights imposes a higher standard than the Fourth Amendment in circumstances in which the defendant establishes that the police affiant intentionally made a false statement in the affidavit even though it turns out it is not essential to the determination of probable cause. See Commonwealth v. Nine Hundred & Ninety-two Dollars, 383 Mass. 764, 768 (1981) (noting that there maybe occasions in which deliberate misrepresentations to a magistrate, even if not essential to a finding of probable cause, would call for suppression under art. 14 of the Massachusetts Declaration of Rights).
17. The question of how to distinguish between negligence and reckless disregard for the truth is not one that was decided in Franks v. Delaware, supra. In Reynolds, the Supreme Judicial Court observed that other courts have defined recklessness “as a lack of reasonable grounds for believing the averments to be true.” Reynolds, 374 Mass. at 146. In Commonwealth v. Nine Hundred & Ninety-Two Dollars, 383 Mass. 764 (1981), the Supreme Judicial Court stated that “[a]t a minimum, we think it is clear that a defendant meets his burden by a showing that the affiant did not have reasonable grounds for believing the material, false statement.” Id. at 769. The court also alluded to a “somewhat less strict standard by analogy to precedents in the area of libel and the First Amendment,” whereby recklessness is deemed to be shown if the affiant entertained serious doubts as to the truth of the statement. Id. See United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2002); United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979).
18. In this case, if we apply the objective test — was there a lack of reasonable grounds for believing the statements contained in paragraph (5) of the affidavit about “benzodiazepine” as the “date rape drug” — the conclusion is that Detective Reale acted with reckless disregard for the truth. The Findings of Fact make it clear that he had no basis for making such an assertion. He was not specially trained in the field of prescription drugs. He had no experience in the investigation of cases like this. He consulted and relied on an unknown source of unknown reliability. He failed to consult sources that were reliable. Finally, the statement is phrased in such a way that the reader may infer that its source is the State Police Crime Lab. The fact that Rohypnol is a tranquilizer in the benzodiazepine family and that drugs in the benzodiazepine family of compounds have been used to induce unconsciousness in a victim in order to facilitate a sexual assault, see, e.g., Commonwealth v. Walker, 442 Mass. 185 (2004), does not affect the assessment of Detective Reale’s blameworthiness. He converted a hypothesis (that benzodiazepine found in the alleged victim’s system was the result of a drug put in her drink by the defendant) into a compelling inference of the defendant’s criminal culpability by disregarding the one explanation that found direct support in the information supplied by the victim (that she used a benzodiazepine called Xanax for her anxiety problems). Moreover, in other critically important respects, as detailed in the above Findings of Fact, Detective Reale’s investigation was deficient. To conclude that he did not act with reckless disregard for the truth would effectively shield affidavits containing false statements from any meaningful review. See United States v. Whitely, supra.
19. A further question is whether there are any omissions from Detective Reale’s affidavit that constitute reckless disregard for presenting a truthful picture of the facts then known to the police. See Town of Walpole, supra, 405 F.3d at 81-82 (“In the case of allegedly material omissions, ‘recklessness may be inferred where the omitted information was critical to the probable cause determination,’ ” quoting Golino v. New Haven, 950 F.2d 864, 861 (2d Cir. 1991); id., citing Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000) (“omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know when deciding whether to issue a warrant”). Here, the affiant omits a crucial fact — namely, that she was under the care of a psychiatrist and had been taking medications such as Xanax which is a drug in the class known as Benzodiazepine. Also, the affidavit does not indicate that the alleged victim had consumed alcoholic drinks prior to arriving at the defendant’s home. See Commonwealth v. Walker, 442 *594 Mass. 185, 192 n. 15 (2004) (“Both the warning label and the expert testimony reflected the concern that is all too well known and too often demonstrated in our society, namely that the combination of sleeping pills and alcohol can be deadly”; in particular, court refers to expert testimony that benzodiazepines when mixed with alcohol has a “synergistic effect”). Further investigation would have revealed to Detective Reale that this is especially true when the prescription drug is a Benzodiazepine. See Appendix A. He also does not report that she drove an automobile both to the defendant’s home and then back to her residence after she allegedly was drugged by the defendant. These omissions constitute facts which any reasonable police should have known were important to the determination of probable cause, and thus their omission from Detective Reale’s affidavit was in reckless disregard for the truth.
20. The second question under the Franks v. Delaware doctrine is whether the affidavit, without the statement that benzodiazepine is the date rape drug, and with the statements about her own drug and alcohol use is sufficient to establish probable cause for the search. In my view the answer is “no.” If the affidavit contained a complete statement of the facts known to the police, there would be no reason to associate the alleged victim’s subjective assessment of memory loss after consuming a drink at the defendant’s home with the secret use of a drug by the defendant. It is far more likely that a magistrate would consider the alleged victim’s use of prescription medication and alcohol as the likely cause. Moreover, it does not follow from the fact that the defendant showed her semi-nude photos of other women that the defendant took nude photos of her. Finally, even if we accept the alleged victim’s feeling on the morning after these events — that she had had sexual intercourse— as evidence that permits an inference that she had sexual intercourse with the defendant — -it does not establish that it was without her consent.
ORDER
The law does not require perfection on the part of law enforcement in the investigation of crime. Likewise, “neither warrants nor their supporting affidavits require a conveyancer’s precise language, and ‘the rigors of an average criminal investigation are not to be intensified by apecksniffian attention to noncrucial detail on review.’ ” Commonwealth v. Cohen, 6 Mass.App.Ct. 653, 655 (1978), quoting Commonwealth v. Von Utter, 355 Mass. 597, 600 (1969). But when there is a report of a serious crime such as rape, the police have a responsibility to conduct a reasonably thorough investigation of the complaint and use reliable sources of information to verify critical details before they apply for a warrant to search a suspect’s home. Unfortunately, that did not occur in this case.
For the above reasons, the defendant’s motion to suppress the physical evidence obtained during the search of the defendant’s home and the statements made at the time by the defendant is ALLOWED.

Detective Reale’s training and experience is set forth in paragraph one of his application for a search warrant which is in evidence as exhibit 5.

The victim told Detective Reale that the defendant gave her something to drink and that her next memory was waking up the following morning at her residence. She also told Detective Reale that she felt “extremely nauseous and semiconscious.” Finally, she said that “her body felt as though she had sexual intercourse.” See Exhibit 5, para. 3.

There is a police report in evidence as exhibit one by Sergeant Leanne Baker of the Westboro Police Department. Detective Real explained that this is an ongoing narrative that is maintained in the department’s computer system and that he (Detective Reale) is actually the author of the second, third and fourth paragraphs of that report.

There is no evidence that she was referring to the defendant.

The DNA analysis identifying the defendant as the source of these sperm cells which is referred to in the Commonwealth’s Grand Juiy presentation was not available at the time of the application for a warrant.

This result by itself does not state or suggest a link to the defendant. See Exhibit 4.

In his testimony before the Grand Jury on November 11, 2005, Sergeant Detective Kalagher testified that the positive result for “Benzodiazepine" in the alleged victim’s system was due to her use of the medicine known as Xanax which is prescribed for symptoms of anxiety. Defendant’s Memorandum of Law, Exhibit 2, Grand Jury minutes, at 10-11. Furthermore, he testified that the blood test was negative for the so-called date rape drug known on the street as “Rohypnol,” which has a generic name of “Flunitrazepam.” Id. at 10. The Commonwealth does not dispute the inaccuracy of the statement contained in paragraph (5) and (7) of Detective Reale’s affidavit. It is true that benzodiazepines may be used to induce unconsciousness in order to render a victim susceptible to a sexual assault. See, e.g., Commonwealth v. Walker, 442 Mass. 185 (2004) (Defendant used a benzodiazepine drug called Temazepam which is a sleeping medication and is commonly referred to as “Restoril” to induce unconsciousness in his victims; court notes that Benzodiazepines also include Valium and Xanax).

See 21 C.F.R. 862.3170 (2006) (“A benzodiazepine test system is a device intended to measure any of the benzodiazepine compounds, sedative and hypnotic drugs, in blood, plasma, and urine. The benzodiazepine compounds include chlordiazepoxide, diazepam, oxazepam, chlorzepate, flurazepam, and Nitrazepam. Measurements obtained by this device are used in the diagnosis and treatment of benzodiazepine use or overdose and in monitoring levels of benzodiazepines to ensure appropriate therapy.”).

See Kobrin v. Gastfriend, 443 Mass. 327, 328 n.2 (2005) (“According to the record, benzodiazepines are narcotics used to treat anxiety and are sometimes abused by those with drug addictions”). See Appendix A. See also United States Department of Justice, Drug Enforcement Administration, Drug Descriptions, found at www.usdoj.gov/dea/con-cem/benzodiazephines.html and National Institute on Drug Abuse at http://www.nida.nih.gov/Infofacts/Rohypnol-GHB.html.