In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-1995

RAUL MOLINA, JACKIE MOLINA, and CHAD MOLINA
and JOSHUA MOLINA, by and through their parents
and next friends Raul and Jackie Molina,

*Plaintiffs-Appellants*,

*v.*

GARY COOPER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 00 C 50230—**Philip G. Reinhard**, *Judge.*

ARGUED DECEMBER 10, 2002—DECIDED APRIL 15, 2003

Before FLAUM, *Chief Judge,* and POSNER and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Following a search of their home, the Molinas brought suit against numerous police officers, arguing that the search warrant for their home was invalid, the "knock and announce" rule was violated, and the use of flash bang devices was unreasonable. The district court granted summary judgment for the officers. Because the Molinas have not shown that the search warrant lacked probable cause, and because the officers

complied with the "knock and announce" rule and reasonably used flash bang devices, we affirm.

## I.  BACKGROUND

The police began investigating Raul Molina after receiving information from two informants, Jason Ramirez and Jason Villa, that he was the head of a drug distribution organization. Ramirez told police in two taped interviews that (among other things) he had been a member of Raul's organization from 1990 until his arrest in 1997, picked up drugs from Raul's home for delivery in the past, and had seen up to one kilogram of cocaine in Raul's residence. Villa also provided a taped statement indicating that Raul controlled a drug organization, Villa dealt five pounds of marijuana a week for Raul for several years until Villa's 1995 arrest, and Villa had incurred a debt with Raul's organization during that time period. On July 3, 1998, in an effort to corroborate these statements, officers Gary Cooper and Robbie Dail searched the Molinas' garbage and several items tested positive for the probable presence of cocaine.

Two days later, Officer Cooper obtained a search warrant for the Molinas' home. In his affidavit in support of the search warrant, Officer Cooper relied upon the positive field tests and the statements he had received from Villa and Ramirez. After a judge found probable cause and issued the search warrant, Officer Cooper met with John Simonton, head of the Tactical Response Team ("TRT"), to decide how the warrant should be executed. Because the TRT assists in executing "high risk" warrants and the information about Raul satisfied the criteria for "high risk"

searches,[1] they agreed that the TRT would participate in the search.

Shortly after midnight on July 6, 1998, the officers searched the Molinas' home in Sterling, Illinois. Simonton said in his deposition that Trooper Bain, a TRT member, initiated the search by knocking on the front door and calling out three times, "Illinois State Police search warrant, open the door!" The Molinas contest this assertion, but only offer Jackie's testimony that she was asleep when the officers arrived and that she woke up to the sound of screaming and yelling.

After no one responded to Trooper Bain's three calls, the TRT claims they waited another five seconds before breaking down the doors and entering the Molinas' home. Jackie Molina jumped out of bed, and was walking towards the hallway leading toward the front door when she was grabbed by a TRT officer and shoved to the ground. Jackie alleges that while she was on the ground one of the TRT officers placed a gun to her head. She was then handcuffed and detained in the living room along with her two children, Chad and Joshua.

After securing the living room, the TRT officers continued searching for Raul. In his deposition, Officer Cooper stated that the officers had previously obtained information that Raul's scheduled work shift ended at 11:00 p.m., and they believed he would be at home when they executed the search warrant. When Raul was not found on the first floor, the TRT officers thought he might be in the basement. The TRT officers threw a flash bang de-

---

[1] Specifically, Raul's criminal history, alleged drug distribution activities, association with gangs, and stash of weapons at his home qualified the search as "high risk."

vice[2] into the basement and went into the basement living room area, but were unable to find Raul. They threw another flash bang device into one of the basement bedrooms, but didn't find Raul. After securing the entire home, the TRT officers learned that Raul was still at work.

The investigating officers, including officers Cooper and Dail, then entered the home and conducted the search. What they found included a set of brass knuckles (which the Molinas contend is actually a belt buckle), a switchblade knife, fireworks, three round plastic balls with functional fuses filled with explosive substances, and a small digital scale commonly used by drug dealers. In their depositions, officers Cooper and Dail said that a "powdery substance" or "haze" was on the scale, but that the substance was not subjected to a field test because doing so would have left too little for laboratory tests. The Molinas were not arrested that night.

Ultimately, the laboratory results confirmed that the substance found on the Molinas' scale was cocaine, but came back negative for two items that had field-tested positive for the probable presence of illegal substances during the search. Raul and Jackie were arrested for possession of a controlled substance, unlawful use of weapons, and possession of drug paraphernalia. Almost a year later, those charges were all dismissed.

Raul, Jackie, Chad, and Joshua Molina filed a 42 U.S.C. § 1983 suit in federal district court, claiming that their constitutional rights were violated by officers who were with the Illinois Police, local police agencies, or multi-

---

[2] These devices are also referred to by the parties as "concussion bombs" or "distraction devices." According to the officers, they emit a bright light and make a loud noise, and are used to distract suspects momentarily so that officers can safely enter occupied areas.

county police task forces ("the officers"). In a thoughtful opinion, the district court granted summary judgment to the officers on all of the plaintiffs' claims. On appeal, the Molinas do not contest many of the district court's findings, but continue to argue lack of probable cause for the search warrant, "knock and announce" violations, unreasonable use of flash bang devices, and unnecessary property damage resulting from the search.

## II.  ANALYSIS

A. Qualified Immunity Defense

We review a grant of summary judgment de novo. *See Campell v. Towse*, 99 F.3d 820, 826 (7th Cir. 1996). A movant is entitled to judgment as a matter of law only if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). We view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001).

The officers, who are all sued in their individual capacities, assert a qualified immunity defense. Here, we focus on whether, taking the facts in the light most favorable to the Molinas, the officers' conduct violated the Molinas' constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Assuming this requirement is met, the next question is whether the constitutional right at issue was clearly established such that a reasonable officer would understand that his actions violated that right. *Id.* at 201-02. The Molinas bear the burden of defeating this defense. *See Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001).

B.  Probable Cause

The plaintiffs allege that the search warrant for their home was not supported by probable cause because Officer Cooper both omitted information and provided false and misleading information in the affidavit he presented to obtain the warrant. However, "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant." S*ee Franks v. Delaware*, 438 U.S. 154, 171 (1978). To overcome this hurdle, the Molinas must provide evidence that the officers "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests." *See Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Franks*, 438 U.S. at 155-56). "Immaterial misstatements will not invalidate an otherwise legitimate warrant." *Forman v. Richmond Police Dep't*, 104 F.3d 950, 964 (7th Cir. 1997). The same rules apply to omissions. *See Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1441 (7th Cir. 1994); *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984).

1.  Villa's statements

The Molinas point to Paragraph 7 of Officer Cooper's affidavit, which relied on Villa's recorded statement, contending that: (1) Villa's information was stale; (2) officers Cooper and Dail coerced Villa's testimony; (3) officers Cooper and Dail used the tape recorder to manipulate Villa's statements; (4) Villa's incriminating statements regarding Raul were false; and (5) officers Cooper and Dail knew the statements were false at the time they were made.

We agree with the district court that "there might be some questions of fact as to whether Cooper had reasons to

doubt the veracity of Villa's allegations." *See Molina ex rel. Molina v. Cooper*, No. 00 C 50230, 2002 WL 426035, at *3 (N.D.Ill. Mar. 18, 2002). Moreover, Villa's information was not particularly timely, as his alleged dealings with Molina ended in 1995, and the warrant was not obtained until July 1998. *See United States v. McNeese*, 901 F.2d 585, 596-97 (7th Cir. 1990), *overruled on other grounds by United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001). For these reasons we agree that the district court properly disregarded Villa's statements in determining whether probable cause existed. However, we also agree with the district court that even if Villa's statements are totally disregarded, Ramirez's statements and the positive field test results from the Molinas' garbage were enough to establish probable cause. *See Franks*, 438 U.S. at 171-72; *Forman*, 104 F.3d at 964.

### 2. Ramirez's statements

The Molinas suggest that the information in the affidavit based on Ramirez's statements is problematic. The portion of Officer Cooper's affidavit that discussed Ramirez's statements follows:

> In 1997 and 1998, the Illinois State Police, Blackhawk Area Task Force, (ISP/BATF), received information from Jason Ramirez. Ramirez advised from 1990 through 1997 until the time he was arrested, Salvador Estrada and himself "Jason Ramirez" were high ranking members of the Molina drug organization. Ramirez advised that during this time Estrada and himself received approximately twenty seven ounces of cocaine a week and approximately fifty pounds of cannabis a month, which they redistributed for Molina. Ramirez then advised that Estrada and himself returned to Raul Molina at least ten thousand

dollars a week from cannabis and cocaine sales during this time period, which totals at least five hundred twenty thousand dollars a year. Ramirez advised that Estrada and himself would pick-up the cocaine directly from Raul Molina at Molina's residence [on] Indian Ridge Road, [in] Sterling, Illinois. The cannabis would be picked up at the Luis Javier Reyes residence on Hunter Street, Sterling, Illinois, where it was being stored for Molina. Reyes is a relative of Molina. Ramirez also advised that Raul Molina keeps his drug records in a ledger in the basement of the Molina residence. Ramirez advised that he has been in the Molina residence on several different occasions, where he has also seen up to a kilogram of cocaine in the basement of the Molina residence.

Specifically, the Molinas claim that Officer Cooper omitted various facts and inconsistencies in his summary of Ramirez's statement. The alleged omissions are failure to: (1) acknowledge that Ramirez gave different numbers regarding the amount of cocaine he allegedly distributed for Raul; (2) note that Ramirez provided contradictory statements regarding the cocaine pick-up location and the presence of cocaine at Raul's residence; (3) mention concerns about Ramirez's statements regarding marijuana distribution, gang involvement, drug suppliers, and drug proceeds; and (4) state that Ramirez provided information to get favorable treatment on his pending criminal aggravated battery charge, and that he was initially released from jail without posting bond.

As to their first assertion that Ramirez gave inconsistent statements during his interview regarding cocaine quantities, Ramirez claimed that the amount of cocaine he delivered varied and depended on demand. And although he provided different figures during the interview, he ultimately settled on approximately 27 ounces per

week.[3] When weighed against Ramirez's detailed, corroborated, self-incriminating, first-hand accounts of Raul's alleged drug distribution activities, it is clear that Officer Cooper's failure to include information about fluctuating cocaine amounts in the search warrant affidavit did not affect the probable cause equation.

Additionally, we reject the Molinas' claim that Ramirez's statements regarding the presence of cocaine in Raul's basement and the pick-up location for the cocaine included blatant inconsistencies. The record suggests that many of these comments are reconcilable (for instance, Ramirez's claim that he picked up drugs at the home of someone named "Chavo" on Thursdays does not conflict with his statement that he picked up drugs from Raul's home two to three times a week), and even if they are not reconcilable, the inconsistencies are of "minimal significance." *See McNeese*, 901 F.2d at 594.

We next address the argument that Officer Cooper had doubts about certain aspects of Ramirez's story, and that those doubts should have been expressed to the judge issuing the warrant. Police officers have a duty to reveal "serious doubts" about an informant's testimony. *See United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (quoting *Williams*, 737 F.2d at 602 (7th Cir. 1984) (citations and internal quotation marks omitted)). Officer Cooper acknowledged that certain parts of Ramirez's statement cast "some" doubt on certain issues, such as the precise amount of marijuana Raul supposedly distributed and whether Raul was involved in a gang. He also agreed that Ramirez's information regarding Raul's alleged drug source and drug proceeds lacked detail. However, there is no evidence that Officer Cooper had *serious* doubts, nor

---

[3]  During questioning by police, Ramirez responded affirmatively on two separate occasions when asked if this figure was accurate.

does the evidence suggest that Officer Cooper *should* have entertained serious doubts in light of Ramirez's statement. An informant is not required to provide details about every single aspect of an alleged drug conspiracy. Morever, details like the identity of Raul's alleged supplier and the location of the alleged drug proceeds would not have necessarily affected the probable cause finding. *McNeese*, 901 F.2d at 595 (noting that in order for a party to establish a *Franks* violation, there must be "a reasonable probability" that a different outcome would have resulted had omitted information been included in the affidavit).

Finally, although the Molinas contend that Ramirez's desire to make a deal should have been reflected in the warrant, the omission was not essential to the probable cause determination. We do not suggest that an informant's motive can never be a factor in assessing whether probable cause exists. However, courts are aware that informants are frequently facing charges and hoping for deals. *See United States v. Wold*, 979 F.2d 632, 634-35 (8th Cir. 1992). Here, Ramirez's testimony was sufficiently reliable that probable cause would have been found even if the informant's motive had been included. As the district court noted, Ramirez's "statements were against his own penal interest as he also implicated himself in a long-running and highly profitable drug conspiracy," Ramirez's detailed testimony linking Raul to the drug conspiracy (for example, Ramirez gave the names and locations of several players in the alleged conspiracy, provided concrete information regarding the amounts of cocaine and money changing hands, and described the locations of the drugs and drug ledgers) was based on first-hand observation, and Officer Cooper independently corroborated some of

Ramirez's statements.[4] *See Molina*, 2002 WL 426035, at \*4. All of these points are strong indicia of reliability. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir. 2000); *United States v. Leidner*, 99 F.3d 1423, 1429-30 (7th Cir. 1996); *United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996); *see also Wold*, 979 F.2d at 634-35 (stating that "failure to inform the issuing officer of a deal is not fatal to the validity of a warrant," especially when an informant's testimony is at least "partly corroborated") (citations and internal quotation marks omitted).

In short, none of the Molinas' arguments negate the simple fact that Ramirez gave critical information based on first-hand knowledge linking Raul to a drug conspiracy, and provided detailed accounts about the conspiracy's inner workings and major players. This information, in conjunction with the field tests discussed below, was

---

[4] This independent corroboration (specifically, the positive field test results from the Molinas' garbage) weakens the plaintiffs' argument that if this court considered the problems with Villa's testimony while assessing the remaining portions of the affidavit, it would find that the Molinas had satisfied the *Franks* test. The Molinas rely on *Whitley*, in which we refused to "consider the officers' credibility regarding the preparation of [an] affidavit in isolation," where the officers had "been exposed as being less than truthful in their testimony regarding searches incident to an investigation." *See* 249 F.3d at 624. However, in *Whitley* we specifically noted that there was not sufficient corroboration of key portions of the affidavit. *Id*. at 623-24. That is not the case here. Additionally, while we earlier agreed that Villa's statements may raise issues of material fact, Officer Cooper has not necessarily been exposed as "less than truthful."

sufficient for a reasonable officer to believe that probable cause had been established.

### 3. The field test

According to officers Cooper and Dail, burnt paper, burnt foil, toothbrushes, and a toilet paper roll found in the Molinas' garbage tested positive for the probable presence of cocaine. Officer Cooper claims that during the field test, the officers took precautions to ensure accuracy, and they showed the test results to their supervisor, Master Sergeant Kerns. These results corroborated Ramirez's statement that Raul was distributing drugs from his home.

The Molinas allege that the field test results are false and the garbage items were never lab tested. They further insist that because field tests conducted during the search tested positive for illegal substances but post-search lab tests came back negative, the field tests were highly unreliable, and Officer Cooper should have discussed the unreliability of the field tests in the search warrant affidavit. These arguments are meritless.

The officers had no duty to send the garbage items to a lab before applying for a warrant. The potential unreliability of the field tests was determined *after* the warrant was obtained, and the Molinas have presented no evidence to show that Officer Cooper thought the field tests were unreliable when he applied for the warrant. *See Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("[P]robable cause depends on information known to the police at the time, not on how things turn out.").

The field tests and Ramirez's statements about Raul's drug involvement were enough for a reasonable officer to believe that probable cause existed to apply for a search warrant, so we affirm the district court's grant of summary judgment for the officers on this claim.

C. "Knock and Announce"

Under the Fourth Amendment, police officers are generally required to knock on the door and announce their identity and purpose before forcibly entering a home to execute a search warrant. *See Richards v. Wisconsin*, 520 U.S. 385, 387 (1997); *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995). The Molinas claim that the search of their home was unlawful because the officers violated this rule by failing to knock and announce their presence. Alternatively, the Molinas argue that even if they did knock and announce, the officers failed to allow a reasonable amount of time to pass before their forcible entry. *See United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001) (imposing such a requirement).

1. Failure to "knock and announce"

We first consider the Molinas' argument that the officers failed to "knock and announce." While we are mindful that our job is not to resolve disputes as to material issues of fact, *see Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001), in this instance there is no real dispute. Jackie claims that she awoke to "screaming and yelling" but could not understand what was being said. Viewing her testimony in the light most favorable to the Molinas, it shows either that the screaming or yelling was actually the sound of the officers knocking and calling out, or that Jackie simply cannot say what the officers did before she awoke. Either way, Jackie's assertions do not create a genuine dispute as to whether the officers "knocked and announced" as Officer Simonton claimed. At best, her allegations raise only a "metaphysical doubt as to the material facts." *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995) (internal quotation marks omitted)).

2.  Failure to wait

As for the Molinas' alternative argument that the police failed to wait a reasonable amount of time after announcing their presence to forcibly enter the house, we are similarly unconvinced. Police officers' compliance with the "knock and announce" requirement is determined on a case-by-case basis. *See Richards*, 520 U.S. at 392; *United States v. McGee*, 280 F.3d 803, 806 (7th Cir. 2002). In *United States v. Jones*, we found that a five to thirteen second wait after "knocking and announcing" did not violate the Fourth Amendment where "the officers had information that the defendant was a dangerous felon in possession of a gun," and an additional wait would have given the defendant time to destroy drugs. *See* 208 F.3d 603, 610 (7th Cir. 2000). The facts in the instant case are similar. The officers had information that Raul, a suspected drug distributor, owned weapons and had a violent criminal history. Although the duration is disputed, the officers claim that five seconds passed after their third and final knock, and that a total of twelve to fifteen seconds passed between their first knock and forcible entry.[5] Under the circumstances, we find that this was a reasonable interval. Even if it was not, the officers would be entitled to qualified immunity. The plaintiffs have not cited any cases which clearly establish that an interval of this length was unconstitutional at the time that they conducted the search. *See Saucier*, 533 U.S. at 201-02. Therefore, we affirm the district court's grant of summary judgment for the officers on the "knock and announce" claim.

---

[5]  Even if this time frame is inaccurate as the plaintiffs contend, the Molinas have not bolstered this argument with any evidence. Just as Jackie's testimony fails to establish a dispute as to whether the officers "knocked and announced" at all, it fails to establish a genuine dispute regarding the time frame of the "knock and announce."

D.  Use of Flash Bang Devices

The Molinas also object to the officers' use of flash bang devices in their basement, claiming that such use was unnecessary and resulted in unreasonable damage to their bar cabinets, television speaker, and garage door. However, the Molinas have failed to establish that the officers' actions were unreasonable.

When assessing whether a constitutional violation has occurred, "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances." *See Graham v. Connor*, 490 U.S. 386, 399 (1989); *see also Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014-15 (7th Cir. 1995) (stating that "all Fourth Amendment reasonableness inquiries must [retain] an objective perspective"). Here, the officers had information that Raul had a criminal record that included aggravated assault, was at home, and had access to weapons. Thus, the officers had ample reason to be concerned about their personal safety. Moreover, flash bang devices were not used in the presence of Jackie or the children, who were secured in the living room, and no one was harmed by them. Therefore, while we in no way suggest that use of flash bang devices is appropriate in every case (or even most cases[6]), we find that their use was reasonable under the circumstances, and the Molinas did not suffer a constitutional violation.[7]

---

[6] Indeed, we have voiced reservations about the use of these devices in recent cases, although we have not gone so far as to find their use unconstitutional. *See United States v. Folks*, 236 F.3d 384, 388 (7th Cir. 2001); *Jones*, 214 F.3d at 837-38.

[7] We note in passing that even if we agreed that a constitutional right was violated when the officers used flash bang devices, the right was not clearly established in July 1998 when the search

(continued...)

E.  Damage to the Truck

The Molinas finally contend that the console and hood of their truck sustained unnecessary damage during the search. We first note that the Molinas have not pointed to any evidence in the record that the alleged damage was unreasonable. Additionally, plaintiffs do not claim to have actually seen any of the seventeen officers involved in the search damage the truck. Moreover, Jackie and Raul acknowledge that their sons had access to the garage. Nevertheless, the Molinas assert that the circumstantial evidence—namely Officer Cooper's admission that he was inside the truck at one point (although he denied damaging the hood)—is sufficient to raise a factual dispute as to whether Officer Cooper damaged the truck.

While we agree with the Molinas that circumstantial evidence can be compelling, like any other evidence it depends on its strength. The facts in this case bear a strong resemblance to those in *Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir. 1992). In *Hessel*, summary judgment was granted to fourteen officers when the plaintiffs admitted that they could not identify which of the officers stole various items from the plaintiffs' home. *Id.* at 305. The Molinas attempt to distinguish *Hessel* because the plaintiffs in that case suffered from a complete inability to distinguish the wrongdoer, whereas here the plaintiffs assert that Officer Cooper is the likely culprit. However, the

---

[7] (...continued)

warrant was executed. At that time, few cases even cited the use of such devices disapprovingly, and in any event those courts found their use reasonable under the circumstances. *See, e.g.*, *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997); *United States v. Kingsley*, No. 97-40095-01-RDR, 1998 WL 295577, at *3-4 (D. Kan. May 21, 1998). Thus, even if we found their actions to be unreasonable, the officers would be entitled to qualified immunity. *Saucier*, 533 U.S. at 201-02.

Molinas have not alleged a conspiracy of silence among the officers (a move that might have strengthened their argument that *Hessel* is inapplicable), and the evidence linking Officer Cooper, one of *seventeen* officers who could conceivably have damaged the truck, is simply too thin to survive summary judgment. No jury could reasonably infer from this evidence that Officer Cooper caused the damage to the truck. *Hessel* is therefore fatal to the plaintiffs' claim, and the district court's grant of summary judgment for the officers was proper.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*