# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4142

CARL R. KRAMER,

Plaintiff-Appellant,

v.

VILLAGE OF NORTH FOND DU LAC
and LARRY WODACK,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 0858—**William C. Griesbach**, *Judge.*

_____

ARGUED MAY 28, 2004—DECIDED SEPTEMBER 27, 2004

_____

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Carl R. Kramer sued the Village
of North Fond du Lac and Chief of Police Larry Wodack,
seeking damages for various constitutional violations, all
under the umbrella of 42 U.S.C. § 1983. The events giving
rise to the lawsuit occurred in 1996 after a criminal inves-
tigation into illegal gambling at taverns in the Village of
North Fond du Lac by means of "payouts" (i.e., exchange of
cash for accumulation of points) on "Cherry Master" video slot
gambling machines. The lower court granted the defendants
summary judgment. The district court's Decision and Order is
attached. After careful review, we affirm and adopt the
Decision and Order as our own.



Copy mailed to attorneys for parties by the Court pursuant to Rule 77 (d) Federal Rules of Civil Procedures.

11-03-03CV.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

USDC EDWI
FILED IN GREEN BAY DIV

NOV - 3 2003

AT_____O'CLOCK_____M
SOFRON B. NEDILSKY

CARL KRAMER,
                    Plaintiff,

        v.                                        Case No. 02-C-858

VILLAGE OF NORTH FOND DU LAC and
LARRY WODACK,
                    Defendants.                   SEP 20 '04 PM 3:21

---

### DECISION AND ORDER

---

Carl Kramer, formerly the owner of the Dog House Saloon in the Village of North Fond du Lac, Wisconsin, brought this civil rights action under 42 U.S.C. § 1983 against the village and its police chief, Larry Wodack. He alleges that his civil rights were violated when the defendants, while acting under color of state law, selectively prosecuted him, in violation of the Equal Protection Clause. The defendants also are alleged to have deprived the plaintiff of liberty and property without due process of law and to have caused him to be subject to an unreasonable search. Before me presently is the defendants' motion for summary judgment. For the reasons stated herein, the motion will be granted.

### I. Factual Background

Much of the factual background of this case is set forth by the Wisconsin Supreme Court in its decision remanding the plaintiff's criminal conviction for commercial gambling crimes, *State v. Kramer*, 2001 WI 132, 248 Wis.2d 1009, 637 N.W.2d 34, and in my January 10, 2003 decision and order in this case which dismissed claims against defendant Thomas Storm, the Fond du Lac County District

36

Attorney. Some facts are worth repeating, however, inasmuch as they remain relevant here.

In the mid-nineties, video gambling machines were widely offered in taverns in Fond du Lac County, including the plaintiff's Dog House Saloon. The machines would not actually pay out money themselves, as in a typical casino slot or video poker machine. Instead, a patron would accumulate points, or credits, on the machine and then ask a bartender to exchange those credits for cash.

While the machines were certainly popular with some bar patrons, they were not universally appreciated in the community. In 1995, Chief Wodack received an anonymous call complaining about the gambling machines and asking the police department to get involved. (Wodack Aff. ¶ 6.) In May 1996, the North Fond du Lac Police Department received a letter from three anonymous residents who complained that their husbands were losing a lot of money every week in the taverns. (Wodack Aff. ¶ 6.) Later, in August, Wodack's department received another anonymous letter urging the department to do something about the video gambling machines in North Fond du Lac. That letter accused the police and politicians of ignoring the problem and letting the "tavern owners rip off the taxpayers." (Lamb Aff., Ex. 69.) Presumably, the tavern owners were not reporting their gambling earnings as taxable income.

The Fond du Lac County district attorneys had not regularly prosecuted offenses involving gambling machines because of what they viewed as the "vagueness of the law". (Storm Aff., Ex. 116.) Specifically, there was apparently some confusion about what constituted a "gambling machine" in violation of Wis.

Stat. § 945.01. But that confusion was dissipated when the Wisconsin Court of Appeals decided *State v. Hahn*, 203 Wis.2d 450, 553 N.W.2d 292 (Wis. Ct. App. 1996). In that case, the court emphasized that video gaming machines were not "gambling machines," *per se*, because they could be used purely for amusement purposes. To violate the law, gambling machines must pay out money or something of value, "even if the player's 'prize' is not automatically awarded by the machine but is awarded by the owner or lessee of the machine." *Id.* at 457-58.

Upon the heels of the *Hahn* decision, a letter was sent to tavern owners and liquor license owners indicating that, following *Hahn*, the policy of the Fond du Lac County Sheriff's Department and District Attorney's Office would be to investigate and prosecute complaints of commercial gambling. The September 2, 1996 letter was written on the sheriff's department stationary and was signed by Sheriff Jim Gilmore and District Attorney Tom Storm, both of whom were previously dismissed as defendants earlier in this action. (Storm Aff., Ex. 116.) The letter was sent only to taverns in unincorporated areas of the county, however, because "incorporated areas [including North Fond du Lac] are serviced by their own law enforcement agencies and are not normally policed by the County sheriff." (DPFF ¶ 102; Storm Aff. ¶ 4.) Thus, none of the tavern owners in North Fond du Lac or other incorporated areas of the county received the warning letter.[1]

---

[1] Although it is not clear from the record, the fact that the letter was on sheriff department stationary and the reason given for why the letter was not sent to taverns located in the incorporated areas of the County, i.e. cities and villages, suggests that it was sent out by the sheriff. While the county sheriff may not normally police cities and villages that have their own police departments, the authority of the district attorney extends throughout the county. Wis. Stat. § 978.05 (2001). Thus, there would have been no reason for the District Attorney to limit the tavern owners who received it to those in the unincorporated sections of the County.

Though the plaintiff did not receive the letter, he admitted that the letter's contents became a "hot topic" among tavern owners in North Fond du Lac and that he became aware of the letter within a week after it was sent out. (Bitar Aff., Ex. 121 at 36.) The plaintiff's central complaint in this action surrounds what happened following the letter's transmittal. At his deposition, he alleged that Chief Wodack told other bar owners to keep operating as usual, and that it was all right to operate games like the "Cherry Master" video gambling machine involved here. (*Id.* at 40.) The plaintiff admitted, however, that he never had a conversation with Chief Wodack about the issue himself. When asked whether Wodack ever told anyone that it would be okay to make payouts for play on the machines (the act which the *Hahn* court found to be illegal), the plaintiff replied, "I don't know about payouts, but he told us to keep operating as we are." (*Id.*)

In fact, Chief Wodack's department, with the assistance of the Lake Winnebago Area Metropolitan Enforcement Group ("MEG") Drug Unit, had actually begun an investigation of commercial gambling in the Village of North Fond du Lac in July 1996.[2] Beginning that month, MEG unit officers went undercover to the taverns in North Fond du Lac and obtained cash payouts from bartenders, including the bartender at the Dog House Saloon. (DPFOF ¶¶ 40-43.) In early December of 1996, one of the investigators obtained anticipatory search warrants for eight Village of North Fond du Lac taverns. Each warrant was to be executed on December 5 if, and only if, the investigators successfully completed a commercial gambling transaction (i.e., received money in exchange for points) on the afternoon of

---

[2]The local police would have been recognizable to the bartenders, so outside assistance was deemed appropriate.

4

December 4 at the tavern for which the warrant was issued. (Bitar Aff., Ex. 1.) The warrants authorized the seizure of "divers goods, chattels and property, to-wit: gambling machines, ledgers, notes, envelopes, currency, utility bills, bank statements, tax returns and other items which identify persons in control of the property and other evidence of crimes of commercial gambling." (Bitar Aff., Ex. 2.) At seven of the eight taverns in the village, the officers were able to meet the requirements of the search warrants (the two machines at one tavern were apparently out of order). (DPFOF ¶ 61.) At the Dog House Saloon, the search turned up several ledgers and envelopes evidencing football and other gambling activity, as well as "one Dyna Cherry Master standing floor model video gambling machine containing $186 in U.S. currency". (Bitar Aff., Ex. 3.)

Several months later, Kramer, along with the owners of the other six taverns at which the search warrants were successfully executed, were charged with various counts of commercial gambling, a felony under Wisconsin law. Wis. Stat. § 945.03(5) (1995). Prior to his 1998 trial, Kramer moved to suppress evidence seized from his tavern on the ground that it had been illegally obtained in violation of the Fourth Amendment and to dismiss the information on the ground he was being selectively prosecuted. The judge denied both motions, finding that the search was reasonable and that Kramer had failed to make out a *prima facie* case of selective prosecution. (Bitar Aff., Ex. 122 at 35-36.) At trial, the plaintiff was found guilty of two counts of commercial gambling, and was sentenced to community service and ordered to make donations to Gamblers Anonymous. (Bitar Aff., Ex. 5.)

Kramer successfully appealed his conviction to the Wisconsin Court of Appeals, which reversed the circuit court's judgment on the ground that he had been selectively prosecuted. *State v. Kramer*, 2000 WI App. 271, 240 Wis.2d 44, 622 N.W.2d 35. The Court of Appeals concluded that the gambling prosecutions had been arbitrarily limited to one geographic area, the Village of North Fond du Lac. Because the State had failed to demonstrate a valid reason for this limitation, the court held that the conviction could not stand. The Wisconsin Supreme Court granted the State's petition for review, however, and reversed. 2001 WI 132, 248 N.W.2d 1009, 637 N.W.2d 35. Although it agreed with the Court of Appeals that Kramer had established a *prima facie* claim of selective prosecution, the Supreme Court concluded that the State had not been afforded the opportunity to rebut the *prima facie* claim by demonstrating a valid exercise of discretion. The Supreme Court therefore remanded the case back to the circuit court for an evidentiary hearing on the rebuttal issue. 248 Wis.2d at 1015. On remand, Kramer entered into a plea bargain with the State, and the judgment of conviction was amended by reducing the two offenses with which he was charged to Class A misdemeanors contrary to Wis. Stat. § 945.04(1m)(b), which prohibits setting up gambling machines to be used for the purpose of gambling. All other terms and conditions of the original judgment remained unchanged. (DPFOF ¶ 78.)

In 2002 the plaintiff brought this civil rights action, alleging that several defendants violated his Constitutional rights. On a motion to dismiss, I dismissed the claims against Thomas Storm, the Fond du Lac District Attorney, based on prosecutorial immunity. Later, pursuant to a stipulation, claims against Fond du Lac

County and its Sheriff, James Gilmore, were dismissed. Remaining are the plaintiff's claims against the Village of North Fond du Lac and its police chief, Larry Wodack.

## II. Analysis

To state a claim for relief under 42 U.S.C. § 1983, the plaintiff must allege: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon them by a person or persons acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). As the second element is satisfied here, the focus will be on whether the plaintiff has produced evidence such that a reasonable jury could find that either of the defendants' actions deprived him of a right secured by the Constitution or federal law.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

### 1. Heck v. Humphrey

One issue defendants have raised as to plaintiff's Fourth Amendment claim should be addressed at the outset since, if decided in defendants' favor, it would seem to dispose of the entire action without further discussion. Defendants claim that plaintiff's Fourth Amendment claim is barred under the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held:

> ... in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. at 486-87. In this case, plaintiff's conviction has not been overturned or set aside. Although his conviction on the original charges was reversed, he later entered into a plea agreement with the State that resulted in misdemeanor convictions for the same conduct. Thus, under *Heck*, it would seem that plaintiff's action should be barred as to those claims that would have rendered his underlying conviction invalid.

In response, plaintiff points out that *Heck* is not bar to § 1983 claims that "would not necessarily imply that the plaintiff's conviction was unlawful." *Id.* at 487 n. 7; *Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir. 1996). Because his Fourth Amendment claim is "the type that 'would not necessarily imply that the plaintiff's

8

conviction was unlawful,'" plaintiff argues that *Heck* does not apply. (Br. In Opp. at 16, quoting *Heck*, id.)

It is true that a conviction can often stand, despite the fact that police may have obtained evidence without probable cause or a warrant in violation of the Fourth Amendment. The availability of other evidence to support a conviction or, as the Court itself noted in *Heck*, the applicability of the inevitable discovery and independent source doctrines, which allow the use of evidence even though it was illegally obtained, make such an outcome more than a possibility. Thus, plaintiff's contention that his Fourth Amendment claim does not imply the invalidity of his conviction, a contention that defendants have not challenged, is sufficient to remove that claim from *Heck*'s bar. But the same does not seem true of plaintiff's other claims. In addition to his claim that the defendants violated his rights under the Fourth Amendment claim, plaintiff also claims that the defendants violated his Fourteenth Amendment right to equal protection by causing his selective prosecution, and his due process right under the same amendment by entrapping him into committing the crime. If proven, either claim would seem to necessarily imply the invalidity of plaintiff's conviction. Selective prosecution and entrapment are complete defenses to a crime. If he had successfully asserted either one of them at his trial, plaintiff would not have been convicted.

But notwithstanding the apparent applicability of *Heck* to plaintiff's equal protection and due process claims, I decline to apply it here. Defendants did not assert *Heck* as a bar to plaintiff's equal protection and due process claims, and so plaintiff had no reason to address its applicability to them. It may be that there are

reasons that are not apparent from the record before me that *Heck* is not applicable to those claims. In any event, it appears defendants have waived *Heck* as a defense to those claims and thus it would be improper for me to apply it. *See Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999).[3] I therefore proceed to address the merits of plaintiff's claims.

### 2. Selective Prosecution / Equal Protection

The plaintiff claims that he and other North Fond du Lac bar owners were singled out for prosecution, in violation of the Equal Protection Clause. In support of the claim that his equal protection rights were violated, the plaintiff relies on the decision of the Wisconsin Supreme Court, which found that he had established a *prima facie* case for selective prosecution in the trial court. *State v. Kramer*, 248 Wis.2d 1009, 637 N.W.2d 35 (Wis. 2001). As noted earlier, Kramer's argument in his criminal appeal was that North Fond du Lac tavern owners were selectively prosecuted solely on the basis of geography. *Id.* at 1019. The Supreme Court found that he made out a *prima facie* case for selective prosecution because the district

---

[3]*Carr* actually suggests another reason why application of *Heck* under these circumstances may be improper. *Heck* involved a § 1983 action brought by a prisoner serving a sentence for the very conviction that his § 1983 lawsuit implicitly challenged. In his concurring opinion, Justice Souter stated that the bar the majority created should be applied only to lawsuits by prisoners who are in custody serving sentences that would be directly implicated by their § 1983 claim. In his view, this limitation on § 1983 actions was justified by the need to preserve the exhaustion requirement of *habeas corpus*. 512 U.S. at 501. Although the *Heck* majority specifically rejected such a limitation, and the Seventh Circuit had previously held it was not so limited, *Anderson v. County of Montgomery*, 111 F.3d 494, 499 (7th Cir. 1997), *Carr* noted that in *Spencer v. Kemna*, 523 U.S. 1 (1998), a majority of justices indicated in dicta that a prisoner's release from custody frees him of the bar *Heck* otherwise places on § 1983 actions. If indeed *Heck* were so limited as Justice Souter said it should be and *Carr* suggests it may be now, then it would not apply here in any event since plaintiff is not now and never has been in custody for his offenses.

attorney only prosecuted North Fond du Lac bar owners to the exclusion of owners in other parts of the county. But the issue of geography, the only alleged grounds for discrimination, dropped out of this case once Storm, Gilmore and Fond du Lac County were dismissed from this action. That is, the original argument charged the district attorney with going after North Fond du Lac residents while favoring residents outside the village. But because the plaintiff is now only proceeding against the police chief of North Fond du Lac and the village itself, he cannot logically claim that North Fond du Lac or its police chief "selectively prosecuted" only taverns in the village, while favoring non-village bars. The plaintiff does not explain how either the village or the chief could have investigated or brought charges against taverns outside their jurisdiction. Here, the evidence is clear (and not disputed) that all similarly situated tavern owners in North Fond du Lac were treated equally. Owners and bartenders at eight taverns were investigated and charged with gambling violations, and numerous gambling machines were seized around the village. Accordingly, because there can be no argument that the chief and the village "selectively prosecuted" village citizens, while favoring non-village citizens, the plaintiff's equal protection claim must be dismissed.[4]

---

[4]While the plaintiff asserts at times that Chief Wodack had some kind of animus against taverns and gambling, which is not altogether unusual for law enforcement officials, he does not adequately assert that there was some kind of vengeance campaign against him such that he could succeed on an equal protection theory of government vindictiveness. *See, e.g., Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir. 1995)(mayor and other city officials developed a "deep-seated animosity" toward the plaintiff in particular.)

Moreover, the plaintiff argues at some length that the community concern about gambling was not really that strong. In fact, he argues, gambling was popular in the community. Even if he were correct, however, a lack of genuine community concern does not preclude law enforcement from doing their job. There is no outcry to enforce jaywalking laws either, but that does not prevent an officer from issuing citations, and it certainly does not turn it into a violation of civil rights.

### 3. Entrapment

Kramer also alleges that Chief Wodack, though he never spoke to nor communicated with the plaintiff, nevertheless lulled the plaintiff into a state of ignorance about the law through his misleading statements to other tavern owners. Specifically, the plaintiff alleges that the chief told other tavern owners that they could continue to use video gambling machines. After the September 2 warning letter had been sent by the sheriff and the district attorney, the chief "conspicuously allowed the misinformation to remain at large in the village and deliberately created the false impression that all was well either by further disseminating the misinformation or deliberately failing to take steps himself to inform the local tavern owners, as he had promised Glenn Van Norman and Roger Lange he would." (Pltf. Br. at 8.) Thus, "the police tactics did not merely affect the timing and location of the crime; they caused the crime." (Pltf. Br. at 14.) As to the village, the plaintiff asserts that it had "a policy of insulating its tavern owners, including the plaintiff, from knowing of the alleged illegality of their actions. There was a custom of lulling them into the belief that they would and should continue practices which were being 'investigated' actively at the time as criminal acts." (Pltf. Br. at 4.)

Thus, the plaintiff's theory of the case is either that the defendants lied to the other tavern owners (though not directly to the plaintiff) or that they had a duty to correct their alleged ignorance about the state of the law. This course of conduct, the argument goes, constitutes entrapment because it allowed the local tavern owners, who were ignorant of the law, to continue committing crimes.

Factually, however, there are several evidentiary noles in the plaintiff's claim. For instance, he agreed that the September 2 letter was a "hot topic" among bar owners. (Bitar Aff., Ex. 121 at 36.) He became aware of the letter within a week of its being sent to other bar owners, and knew at least that it "purportedly referred to a change in the law regarding gaming machines." (Kramer Aff. ¶ 9.) Thus, it is unclear why he continued to believe that payouts from gambling machines would be legal. A second factual weakness is the attenuated nature of the communication (if any) between Wodack and the plaintiff. Kramer admits that he never even spoke to Wodack about gambling machines. Indeed, the only link to the chief is that he "had heard from Carol Van Norman [another tavern owner] about a conversation Glenn Van Norman had with Wodack in which Wodack assured Van Norman that he had no problem with the gaming machines at that time and would let him know if his position on that ever changed." (Kramer Aff. ¶ 10.) That Wodack had said this to the Van Normans might show that he was intentionally deceiving *them*; but there is no evidence that Wodack's actions, in speaking to the Van Normans, were somehow directed at the plaintiff. Thus, the plaintiff's claim is reduced to the non-starter argument that Wodack, in talking to other bar owners, deprived the plaintiff of a constitutional right. Accordingly, even if the plaintiff's rights were violated in the abstract, he does not have any evidence that Wodack or the village are the parties responsible for that violation.

A third factual problem stems from the plaintiff's admission that he never heard that Wodack said it would be okay to make *payouts* from the machines. (Bitar Aff., Ex. 121 at 40.) Payouts are the act that turns amusement machines into illegal

13

gambling machines, according to *Hahn*. Thus, even if Wodack told other bar owners that the machines themselves were all right, as *Hahn* acknowledged, if Wodack never said that payouts were acceptable he would not have been misrepresenting the law to them. Finally, other than conjecture, Kramer does not put forth any evidence to support his theory that the village had some sort of policy or practice geared towards keeping tavern owners in the dark about the illegality of gambling.

To summarize the above, the evidence is undisputed that the plaintiff, who knew the gist of the September 2 warning letter, never talked to Chief Wodack and never even heard through the grapevine that Wodack said payouts were acceptable. It is certainly possible that the plaintiff's reliance on local gossip for legal advice led to his being charged with commercial gambling. But there is no evidence that can connect either of the defendants to the deprivation of rights claimed here. Talking to bar owners outside of the plaintiff's presence simply does not constitute entrapment of the plaintiff. Accordingly, I do not find that the plaintiff has adequately created a genuine issue of material fact as to entrapment and that judgment as a matter of law is appropriate on this issue.

But Kramer's problems do not end with the tenuous factual footing he presents here. Even if genuine issues of fact existed on the entrapment claim, entrapment is an affirmative defense in a criminal case, not a cause of action under § 1983. The plaintiff, however, cites a Seventh Circuit case for the proposition that an entrapment claim may arise under § 1983 "if the violation 'created a serious risk of convicting an innocent person'". (Pltf. Br. at 12, citing *Eaglin v. Welborn*, 57 F.3d 496, 501 (7th Cir. 1995)). Instead, the *Eaglin* case says exactly the opposite, and its terms are not

exactly vague: "entrapment is an excuse for, not a denial of, crime. A defendant prevented from asserting the defense [of entrapment] in violation of state law cannot complain that the violation created a peril of convicting an innocent person." *Id.* Thus, under Seventh Circuit law, even if he was entrapped, the plaintiff was never "innocent" because he actually did commit the crimes charged.

Notwithstanding the above, the plaintiff correctly notes that entrapment can constitute a form of government conduct that could violate due process. *See United States v. Russell,* 411 U.S. 423, 431-32 (1973). But substantive due process is among the stingiest of constitutional protections, and the Supreme Court has limited relief to instances where law enforcement conduct violates "fundamental fairness, shocking to the universal sense of justice." *Id.* In this circuit, *Russell* has been found to present "an extremely narrow opportunity ... to challenge government conduct." *United States v. Davis,* 15 F.3d 1393, 1415 (7th Cir. 1994).

The plaintiff attempts to equate his plight to the situation of the criminal defendant in *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971), but that case was a criminal appeal, not a civil rights case, and thus did not involve due process. It also pre-dates *Russell,* and its relevance is therefore questionable at best. In any event, even taking the facts in the light most favorable to the plaintiff, it is clear that the actions of the defendants here do not amount to the sort of "shocking" governmental behavior that would violate due process. As the Eighth Circuit has recognized, the focus in a due process entrapment context "must be on the defendant's own predisposition to commit the crime, and not on the tactics employed by the police to entice him into the crime." *Gunderson v. Schlueter,* 904 F.2d 407,

410 (8th Cir. 199u). That court noted that even when entrapment had been established as a matter of law, and even when personal animosity against the plaintiff was established, it would only be the rarest of cases in which a due process violation would be found. *Id.* at 411. In this case, the plaintiff was the party engaged in illegal gambling, and had been doing so before the prosecutorial warning letter and before any contact with Chief Wodack. Further, Kramer admits that he did not change his behavior even after hearing about the prosecutorial warning letter. Thus, Kramer's predisposition towards the crime precludes him from now asserting that the government's conduct in "lulling" him into a false sense of security was somehow shocking or violative of his substantive due process rights. And, even assuming that the village and its chief deliberately left the plaintiff in the dark about the change in the law, the plaintiff has yet to cite any authority which would impose on the chief or the village an affirmative duty to warn the plaintiff that he was breaking the law. Accordingly, as no genuine issues of material fact remain, and as the plaintiff's legal argument is unsupportable, summary judgment is appropriate on this issue as well.

4. Fourth Amendment

Finally, the plaintiff claims that the search on his premises violated the Fourth Amendment because the warrant was "not objectively reasonable, because of their entrapment of the tavern owners and withholding of the true and full picture from the prosecutor, and that it created the unnecessary danger of an unlawful prosecution of Kramer and other tavern owners." (Pltf. Br. at 15.)

Once again, entrapment is an affirmative defense in a criminal case. As the Seventh Circuit noted,

> Entrapment is not part of our Fourth Amendment probable-cause-to-arrest analysis. That analysis requires one to examine the circumstances from the view of an objectively reasonable police officer. Entrapment, on the other hand, is an affirmative defense of a criminal defendant to otherwise culpable conduct. We note, for argument's sake, that even if Humphrey had successfully asserted the defense of entrapment during his criminal prosecution, probable cause to arrest is not necessarily negated by a defendant's successful assertion at trial of an entrapment defense.

*Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998).

When a warrant has been obtained, as here, the plaintiff must provide evidence that the officer "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests." *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). The plaintiff cannot meet this standard here. Section 1983 imposes personal liability when an individual, acting under color of law, deprives another individual of his Constitutional rights. Here, there is no indication that Chief Wodack was even involved in obtaining or executing the search warrant. Instead, it appears that Officer Tim Bakri was responsible for signing all the affidavits and obtaining the search warrant, which was signed by Judge Henry Buslee on or about December 4, 1996 (it was undated). (DPFOF ¶¶ 52-53.) Accordingly, as with his entrapment claim, the plaintiff simply cannot link any conduct of the defendants to what he essentially alleges was a bogus search warrant. Because § 1983 does not impose *respondeat superior* liability, and because the plaintiff has not shown any causal link between either defendants' actions and the alleged deprivation of his rights, the Fourth Amendment claims against him and the village must be dismissed.

17

Therefore, for the reasons stated herein, IT IS ORDERED that the defendants'
motion for summary judgment is GRANTED, and this case is DISMISSED.

Dated this _____ day of November, 2003.

William C. Griesbach
United States District Judge

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*