In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2464

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

L.E. MYERS COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 1205—**James B. Zagel**, *Judge.*

ARGUED FEBRUARY 26, 2008—DECIDED APRIL 10, 2009

Before KANNE, SYKES, and TINDER, *Circuit Judges*.

SYKES, *Circuit Judge.* L.E. Myers Company, a large
electrical contractor, was convicted of willfully violating
Occupational Safety and Health Administration ("OSHA")
regulations, causing the death of one of its employees.
*See* 29 U.S.C. § 666(e). An apprentice linesman in the
early stages of his training with L.E. Myers was killed
while working on a repair assignment atop a trans-
mission tower owned by Commonwealth Edison
("ComEd"). The "static" wire on the tower was not in

fact "static" (i.e., a grounded "dead" wire) but instead was energized; the apprentice came into contact with it and was electrocuted.

On appeal L.E. Myers argues that the magistrate judge who presided at trial improperly instructed the jury on the issues of corporate knowledge and conscious avoidance. The company also argues that the judge erroneously excluded evidence of a 1979 fatality involving a ComEd linesman who was electrocuted by contact with an energized static wire. Finally, the company claims it is entitled to a new trial based on a proposed OSHA regulation creating new duties for "host employers" like ComEd regarding hazards at their transmission facilities. The proposed rule, published for notice and comment after the trial was concluded, was accompanied by an explanatory comment from OSHA describing energized static wires as one such hazard.

We reverse. The magistrate judge improperly instructed the jury on corporate knowledge and conscious avoidance. Corporate knowledge in this context includes knowledge of hazards acquired by the corporation's employees *provided* the employees in question are responsible for reporting such hazards to the corporate hierarchy. This important proviso was omitted from the jury instruction on corporate knowledge. Furthermore, there was insufficient evidentiary support for the conscious avoidance or "ostrich" instruction; it should not have been given. Because the statute's willfulness requirement was the central point of contention in this criminal OSHA case, we are not convinced that these

instructional errors were harmless. Remand for retrial is required.

We reject L.E. Myers's evidentiary argument, however; the evidence of the 1979 ComEd fatality was properly excluded. Finally, because we are reversing for a new trial based on instructional error, we need not address whether L.E. Myers is entitled to a new trial based on the proposed OSHA regulation.

## I. Background

Electric transmission towers carry high-voltage electricity from generating plants to distribution networks for further distribution to the utility's customers. These towers typically have six energized power lines, three on each side of the tower. A "static wire" runs above the power lines on each side and acts as a lightning rod, directing strikes of lightning toward the towers and then to the ground, preserving the insulators and the wires. Energized power lines have 10-foot insulators connecting the lines to the tower. A static wire, however, usually will not have any insulator between itself and the tower; it is a grounded "dead" wire. In rare instances a static wire can become spontaneously energized by induction, depending on its proximity to and the level of voltage in the transmission lines.

L.E. Myers is one of the largest electrical contractors in the nation and contracts with electric utilities to provide maintenance and repair work on transmission lines. L.E. Myers had a longstanding contractual relationship

with ComEd to perform maintenance and repair work on ComEd's transmission network in the Chicago area and received regular work assignments from ComEd to service its transmission towers. Under the L.E. Myers/ComEd contract and L.E. Myers's collective bargaining agreement with its employees, L.E. Myers was responsible for compliance with OSHA safety standards on these service jobs.

In 1968 one of ComEd's transmission towers located in the flight path of O'Hare Airport in Chicago was nearly struck by a plane. As a result, the Federal Aviation Administration required ComEd to place lights on top of its transmission towers near airports in the Chicago area. To power the lights, ComEd energized the static wire on one side of the affected towers, making it an "energized static wire," which would otherwise be an oxymoron. The energized static wires on these towers had small six-inch insulators separating them from the towers.

## A.  The Blake Lane Fatality

On December 27, 1999, ComEd asked L.E. Myers to perform emergency service on Tower 97 in Mt. Prospect, Illinois. ComEd's visual inspection of the tower had revealed that the pin holding the static wire on the east side of the tower was loose. If the wire broke free, it could fall onto the transmission wires below, causing power outages. The next day L.E. Myers assembled a crew for this assignment: Roger Nelson, a general foreman; Darin West, a foreman; and apprentices Blake Lane

and Robert Huchel. Lane and Huchel had recently gradu-
ated from the American Line Builders Joint Apprentice-
ship and Training Program and had just that month
started working at L.E. Myers as apprentice linesmen.
Norman Streseman, a ComEd inspector, was present at
the job site to ensure that the work was completed; in ac-
cordance with the contract and ComEd policy, however,
he did not directly supervise the repair work.

The L.E. Myers crew arrived at Tower 97 and briefly
discussed the work to be done, but West (the foreman)
did not read the ComEd construction specifications
included in the work order. Huchel stayed on the
ground with Nelson to operate the "hand line"—a pulley
used to send equipment up and down the tower. West
and Lane climbed up the tower and successfully
secured the east-side static wire. Nelson, the general
foreman, then called up to them to check the west-side
static wire to see if it was loose as well. Nelson had
visually examined the east-side static wire with the aid
of binoculars before West and Lane climbed the tower;
he had not, however, visually inspected the west-side
static wire and so did not notice the small insulator
attached to it.

In response to Nelson's direction, West sent Lane to the
other side of the tower to check the west-side static
wire. West did not notice the insulator either. From his
vantage point on the opposite side of the tower, he
could not see the hardware connected to the west-side
static wire. West told Lane not to touch the static wire—
but not because he understood that it was energized.

Rather, he told Lane not to touch the wire because he thought the pin might break loose, causing the wire to fall onto the power lines. Lane accidentally touched the energized west-side static wire and was fatally electrocuted.

## B.  The Wade Cumpston Fatality

About three months later, on March 25, 2000, Wade Cumpston, a journeyman linesman with extensive experience working on electrical towers, was part of an L.E. Myers crew replacing insulators on another set of transmission lines. The wires on the side where the crew was working had been de-energized, but the wires on the other side had not. This left the possibility that the de-energized wires could become energized by induction from the high voltage in the energized wires. To mitigate the risk, the crew was required to use grounding cables to connect the uninsulated bucket they worked in to the tower.

The crew working on the tower complained to the foreman, Clifton Gooch, that the grounding cables were too short. Gooch said he would ask Nelson (again, the general foreman on this job) about replacing the cables. When the men complained again, Gooch told them to do the work with the cables they had or go home. The linesmen successfully replaced two insulators without incident using the grounding cables they thought were too short. As they removed the grounds from the next insulator, however, Cumpston and another member of the crew were electrocuted. Cumpston was killed. The

other crew member survived, but the accident severely damaged his memory and he was unable to recall what happened with the grounding cables. No one else on the job saw what happened when the two were electrocuted.

### C. The OSHA Charges

L.E. Myers was charged under 29 U.S.C. § 666(e) with two counts of willfully violating numerous OSHA regulations, causing the deaths of Blake Lane and Wade Cumpston. More specifically, the government alleged that L.E. Myers had failed to properly train its employees, improperly determined work-site conditions, failed to conduct a prejob briefing of potential hazards, failed to ensure that employees were qualified for the work they were performing, failed to ensure that employees maintained a minimum safe-approach distance to energized power lines, and (with respect to the Wade Cumpston fatality) failed to ensure proper use of grounding cables. *See* 29 C.F.R. §§ 1910.269(a)(2)(i), .269(a)(3), .269(c), .269(*l*)(1), .269(*l*)(2), & .269(n)(3). The defendant waived the right to trial before a district judge and consented to a jury trial before a magistrate judge. *See* FED. R. CRIM. P. 58(b)(3).

At trial the government sought to establish that energized static wires were a common occurrence on transmission towers around airports in northern Illinois. It introduced a ComEd map depicting the location of towers with energized static wires and also introduced the contract between ComEd and L.E. Myers, in which L.E. Myers represented that it was familiar with ComEd's facilities and transmission system. Streseman, the ComEd

inspector on site at the time of the Lane fatality, testified that he had seen the insulator on the static wire on the west side of the tower and brought it to the attention of West, the L.E. Myers foreman. The government also elicited testimony from witnesses in the electrical industry that it was standard practice to treat all electrical lines as energized unless grounded or otherwise secured as "dead" or nonenergized.

L.E. Myers employees testified that they had never heard of an energized static wire and therefore never thought they would need to look for signs of one. West conceded that he had not read the work order that ComEd had given to him, but also testified that it was not relevant because Streseman had already verbally told him what needed to be done and the written materials did not contain any information about the energized west-side static wire. The L.E. Myers employees acknowledged, however, that they could have discovered the insulator on the west-side static wire had they looked for it and that none of them had used binoculars to examine that side of the tower. Witnesses testified that although Blake Lane was an apprentice, the union manual encouraged employers to send apprentices into the transmission towers as soon as possible in order to gain experience necessary to progress through their apprenticeship. These witnesses also testified that climbing a steel tower is significantly easier than climbing wooden pole distribution towers on which apprentices are initially trained.

Regarding the Wade Cumpston fatality, Michael Young, a member of the crew, testified that he complained to the

foremen that the grounding cables were too short and that he and Cumpston had difficulty adequately grounding the first transmission wires they worked on. Young also testified that the cables provided by L.E. Myers did not have the proper type of clamp for grounding the transmission wires. Other witnesses contradicted this testimony, however, and an expert for L.E. Myers testified that the grounding cables were the correct length and type for the kind of work the men were doing.

To bolster its proof that L.E. Myers acted willfully or with deliberate indifference, the government introduced evidence of a service call in October of 1970 in which L.E. Myers performed repair work on a ComEd tower with an energized static wire. ComEd's records from this job reflected that the L.E. Myers crew repaired the static wire without incident. In its closing argument, the government maintained that the evidence regarding the 1970 service call established that L.E. Myers knew that some of ComEd's towers had energized static wires.

L.E. Myers sought to introduce evidence about a 1979 incident in which a ComEd lineman was electrocuted when he came into contact with an energized static wire. Notes prepared by an OSHA compliance officer after this fatality indicated that the officer recommended that ComEd consider placing warning signs at towers with energized static wires, and that in response ComEd agreed to take certain other precautionary measures to warn outside contractors about the location of energized static wires. L.E. Myers argued that this evidence helped to establish as a general matter that energized static

wires were not commonly recognized, and more specifically, that the evidence was exculpatory because there was no such warning from ComEd prior to the Blake Lane fatality. The magistrate judge thought the evidence of the 1979 accident was irrelevant and potentially misleading and therefore excluded it.

The jury-instruction conference produced several disagreements among the parties. The government's proposed instructions told the jury that as to each of the two counts, "the government must prove that at least one willful violation of one of the OSHA regulations set forth in that count caused the death of an employee." The instructions went on to define "willful" as follows:

> A violation of an OSHA regulation or safety standard is willful if the employer had actual knowledge that its actions did not comply with the regulation or standard, and the employer intentionally disregarded the requirements of the regulation or standard or was deliberately indifferent to those requirements. The employer need not have acted maliciously or specifically intended to harm its employees.

The instructions also defined the "actual knowledge" of a corporation as follows:

> In deciding whether the defendant corporation acted knowingly, you must consider that a corporation can act only through its employees and agents. Accordingly, knowledge obtained by the corporation's employees acting within the scope of their employment that concerns a matter within the scope of their employment is knowledge possessed by the corporation.

> Once a corporation acquires that knowledge, it remains with the corporation even if the employee is no longer employed by the corporation, if the knowledge is of continuing importance to the business of the corporation.

This "corporate knowledge" instruction was tailored in part to explain the legal significance of the evidence regarding the 1970 service call. The core of L.E. Myers's defense to the count involving the Blake Lane fatality was that energized static wires were not a well-known phenomenon and the company did not have actual knowledge of the existence of this hazard. The government argued that L.E. Myers knew that energized static wires were present on at least *some* of ComEd's towers because the October 1970 service call involved the repair of a static wire on a tower with an energized static wire. According to the government, the knowledge acquired by the crew on the 1970 service call was the corporation's knowledge, and it remained with the corporation through the 1999 accident that killed Blake Lane.

L.E. Myers objected to the proposed definition of corporate knowledge, arguing that under *United States v. Ladish Malting Co.*, 135 F.3d 484 (7th Cir. 1998), an employee who obtains knowledge of a given hazard must also have a duty to report that information to superiors or to ameliorate the condition for the employee's knowledge to be considered the corporation's. The company asked the magistrate judge to amend the corporate-knowledge instruction to reflect this principle. The judge declined and gave the corporate-knowledge instruction as it appears above.

In addition, the government asked for a "conscious avoidance" instruction, more colloquially known as the "ostrich instruction." The ostrich instruction permitted the jury to infer knowledge "from a combination of suspicion and indifference to the truth." More specifically, the ostrich instruction told the jury that "[i]f you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly." L.E. Myers objected to this instruction as well, arguing that the evidence did not support it. The magistrate judge disagreed and included the ostrich instruction along with the other instructions on willfulness noted above.

The jury found L.E. Myers guilty on the § 666(e) count involving the death of Blake Lane but not guilty on the § 666(e) count involving the death of Wade Cumpston. The magistrate judge imposed a sentence of three years' probation and a fine of $500,000. *See* 18 U.S.C. § 3571(c)(4) (organizational defendant found guilty of a misdemeanor resulting in death may be fined up to $500,000).

L.E. Myers moved for a new trial under Rule 33 of the *Federal Rules of Criminal Procedure* based on newly discovered evidence, or alternatively, a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). L.E. Myers noted that OSHA had proposed a new safety regulation regarding hazards at transmission facilities and argued that the new regulation was either newly discovered evidence or *Brady*

evidence bearing on the issue of its knowledge of the energized-static-wire hazard. The new rule would require "host" utilities like ComEd to warn contractors about hazards on their transmission systems that might not be recognized by the contractors' employees. The commentary accompanying the proposed rule identified energized static wires as one such hazard. OSHA published this proposed new safety standard and explanatory commentary in the *Federal Register,* 70 Fed. Reg. 34,822, after the jury returned its verdict.

The magistrate judge denied the motion for a new trial, noting that the proposed new rule did not relieve L.E. Myers of liability but rather imposed additional safety responsibilities on ComEd. In addition, the judge thought that a new trial was not warranted because the proposed rule was subject to change and was not yet the official policy of OSHA. Finally, the judge held that the proposed new rule had no bearing on L.E. Myers's liability because it was published for notice and comment long after the events at issue in the case.

L.E. Myers appealed to the district court. *See* FED. R. CRIM. P. 58(g)(2)(D). The district court held that the jury instruction on corporate knowledge improperly omitted the *Ladish* requirement that the employee acquiring knowledge of a hazard must also have a duty to report the hazard up the corporate chain for the employee's knowledge to be considered the corporation's. In addition, the court held that the evidence did not support the magistrate judge's decision to give the ostrich instruction. The court concluded, however, that these instruc-

tional errors were harmless. Finally, the court affirmed the exclusion of the evidence regarding the 1979 ComEd fatality and the denial of L.E. Myers's motion for a new trial. L.E. Myers appealed.

## II.  Analysis

### A.  "Corporate Knowledge" and "Ostrich" Jury Instructions

L.E. Myers renews its challenges to the "corporate knowledge" and "ostrich" jury instructions. We review claims of instructional error de novo. *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003).

The statute under which L.E. Myers was convicted punishes employers who "willfully violate[] any standard, rule, or order [promulgated by OSHA] . . . and that violation caused death to any employee." 29 U.S.C. § 666(e). In *Ladish*, we comprehensively addressed the statute's "willfully" requirement, holding that it is synonymous with "knowingly" and thus requires "awareness of the essential facts and [applicable] legal requirements." 135 F.3d at 490. We held that this means "*actual* knowledge" of both the hazardous condition in question and the associated legal obligations; it is not enough that the circumstances and conduct of the employer are such that the employer merely *should have known* of the hazardous condition and associated legal obligations. *Id.* at 487-88. *Ladish* further held that "[k]nowledge may be proved by showing deliberate indifference to the facts or the law . . . or by showing awareness of a significant risk

coupled with steps to avoid additional information, as with an ostrich instruction, but in either event what must be proved beyond a reasonable doubt is actual rather than constructive knowledge." *Id.* at 490.

*Ladish* also addressed the concept of corporate knowledge. The defendant Ladish Malting Company had argued that "corporate knowledge means supervisors' knowledge." *Id.* at 492. We rejected that understanding of corporate knowledge as too narrow. But we also rejected the proposition that a corporation "knows" what *any* of its employees know. That would have been too broad. We noted that "the knowledge of a worker who trips over a safety hazard but does not understand or report what he has found does not count. Most federal statutes that make anything of corporate knowledge also require the knowledge to be possessed by persons authorized to do something about what they know." *Id*. at 492-93.

We thus observed in *Ladish* that "[c]orporations 'know' what their employees who are responsible for an aspect of the business know." *Id.* at 492. More specifically, in the context of a criminal OSHA prosecution, we held that a definition "which asks whether a particular person has been given responsibility over safety . . . makes more sense than asking whether someone is a supervisor." *Id.* at 493. We noted that "employers may decide for themselves who is 'authorized' to inspect the plant for safety hazards, who is to receive and respond to safety complaints, and who is to report to the persons with authority to make decisions." *Id.* Accordingly, we held that "[i]f

'authorized agents' with reporting duties acquire actual knowledge, it is entirely sensible to say that the corporation has acquired knowledge." *Id*. Based on this understanding of corporate knowledge, we approved jury instructions that "told the jury to consider the knowledge of Ladish's 'officers, directors, and authorized agents' provided 'that [the] supervisor or employee has some duty to communicate that knowledge to someone higher up in the corporation.'" *Id.*

Here, the magistrate judge instructed the jury that "knowledge obtained by the corporation's employees acting within the scope of their employment that concerns a matter within the scope of their employment is knowledge possessed by the corporation." L.E. Myers argues that this formulation of the corporate-knowledge instruction was inaccurate and misleading because it contained no reference to the *Ladish* requirement that the employee who acquires knowledge of the safety hazard in question must have a duty to report that knowledge to the company for his knowledge to be deemed the corporation's knowledge. We agree. The "scope of employment" language adopted by the magistrate judge misses the material point of *Ladish*. The proper inquiry is not whether the employee who acquires knowledge of a given hazard was acting within the scope of his employment when he did so but whether he was an employee with a duty to report or ameliorate such hazards. The corporate-knowledge instruction adopted by the magistrate judge erroneously omitted this qualifying language.

L.E. Myers also argues the magistrate judge should not have given the "conscious avoidance" or "ostrich" instruc-

tion. Again, we agree. The ostrich instruction is appro-priate "only when it addresses an issue reasonably raised by the evidence." *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988). It is appropriate where the actions of the defendant and "the surrounding circumstances indicate that the only way the defendant could not have known of the illegal activity is by affirmatively avoiding the knowledge." *United States v. Fauls*, 65 F.3d 592, 598-99 (7th Cir. 1995). The defendant must claim "a lack of guilty knowledge," and there must be "facts and evidence that support an inference of deliberate ignorance." *Diaz*, 864 F.2d at 550 (internal quotation marks omitted).

Evidence that a defendant reasonably should have had strong suspicions about the operative illegality is not sufficient to support the ostrich instruction. *United States v. Carrillo*, 435 F.3d 767, 782 (7th Cir. 2006). Stated differently:

> [A] jury must not be invited to infer that a particular defendant deliberately avoided knowledge on the basis of evidence that only supports the inference that a reasonable person in the situation would have deliberately avoided knowledge. As we have said, the instruction should only be given where "there are facts and evidence that support an inference of deliberate ignorance" . . . .

*Id.* (quoting *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001)). Accordingly, we have held that to support an inference of "deliberate ignorance," there must be evidence that the defendant took "steps to make sure that he [did] not acquire full or exact knowledge of the nature and

extent of" the illegal activity. *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990). Failing to display curiosity is not enough; the defendant must affirmatively "*act* to avoid learning the truth." *Id*.

Here, the government can point to no evidence that any L.E. Myers employee took deliberate steps to avoid learning the truth. True, there is evidence of deliberate *indifference* to the facts, but there is no evidence of deliberate *avoidance,* and the latter is required for the ostrich instruction. Accordingly, it was error to give the ostrich instruction.

The district court reached the same conclusions as we have here that the corporate-knowledge instruction incorrectly stated the law and the ostrich instruction was not supported by the evidence. The court concluded, however, that the errors were harmless. Reluctantly, we cannot agree. These instructions went to the heart and most hotly contested aspect of the case: whether L.E. Myers's conduct was willful. The improper corporate-knowledge instruction told the jury that it could find a "willful" violation of the statute if any L.E. Myers employee was aware of or was deliberately indifferent to the facts relating to the hazard in question, i.e., energized static wires. The ostrich instruction, which should not have been given at all, compounded this error, telling the jury that it could "infer knowledge from a combination of suspicion and indifference to the truth." The cumulative effect of these instructional errors was to significantly "water down" the willfulness requirement of the § 666(e) offense, *Ladish*, 135 F.3d at 488, if not to the degree at issue

in *Ladish* itself, at least to a degree that cannot be considered harmless given the centrality of this issue to L.E. Myers's defense.

This is especially true because of the emphasis the government placed on the evidence of the 1970 service call. It relied heavily on that episode to argue that L.E. Myers had actual knowledge of the presence of energized static wires on some ComEd transmission towers. The misleading instruction on corporate knowledge came close to directing the jury to find corporate knowledge from the evidence of the 1970 service call; there was no evidence that the employees on that crew were acting outside the scope of their employment, and that's the only qualifier the corporate-knowledge instruction contained.

The government downplays the significance of this evidence, asserting that the "fundamental issue for the jury was not whether [L.E. Myers] knew that static wires were sometimes energized," but only "whether L.E. Myers knew it was violating OSHA standards at the Mt. Prospect work site in 1999." But whether L.E. Myers knowingly violated OSHA standards at the Mt. Prospect work site in 1999 requires *both* that it had actual knowledge of the applicable standards (it never denied this) *and* that it "act[ed] 'knowingly' with respect to the facts." *Id.* at 487. The latter requires knowledge of or deliberate indifference to the hazardous condition at issue—that is, energized static wires. *Id.* On this point, the district court suggested that "the case *could* have been won without the 1970 evidence" and thought the jury "*could* easily

discount the significance" of the 1970 service call. (Emphasis added.) Maybe so, but that's not the harmless-error standard. On harmless-error review, the government has the burden of establishing that it is clear beyond a reasonable doubt that the jury would have convicted absent the error. *United States v. Mansoori*, 480 F.3d 514, 523 (7th Cir. 2007) (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)). For the reasons we have explained, it has not carried that burden here. Remand for retrial is required.

**B.  Exclusion of the 1979 ComEd Fatality**

L.E. Myers also argues that the magistrate judge improperly excluded evidence of the fatality in 1979 involving a ComEd linesman who accidently came into contact with an energized static wire. This argument needs only brief attention. We review claims of evidentiary error for abuse of discretion, *United States v. Thomas*, 453 F.3d 838, 844-45 (7th Cir. 2006), which occurs only where "no reasonable person could take the view adopted by the trial court," *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005).

OSHA investigated the 1979 accident, and notes made by the agency's compliance officer reflect that a recommendation was made that ComEd place warnings on towers with energized static lines for the benefit of its outside contractors. L.E. Myers wanted to introduce this evidence to bolster its argument that energized static wires were not a commonly recognized hazard in 1999.

It was not an abuse of discretion to exclude this evidence. The compliance officer's notes do not reflect a formal

agreement between OSHA and ComEd to post warnings about energized static wires. Nor do they help to clarify whether energized static wires were a commonly recognized hazard in 1999. The evidence was also potentially misleading; a discussion between OSHA and ComEd about ComEd's safety practices does not relieve L.E. Myers of liability for its own compliance with OSHA regulations. The evidence of the 1979 fatality was properly excluded.

## C.  The Denial of the Rule 33 Motion

L.E. Myers moved for a new trial under Rule 33 of the *Federal Rules of Criminal Procedure* based on newly discovered evidence or, alternatively, a *Brady* violation. The "new evidence" (or alternatively, the basis for the *Brady* claim) was a proposed new safety standard published by OSHA for notice and comment after the trial concluded. The proposed new rule would require "host utilities" like ComEd to warn outside contractors of hazards their employees might not otherwise recognize. The commentary published with the proposed rule describes energized static wires as one such hazard.

The magistrate judge denied the motion for a new trial and the district court affirmed. Because we are remanding for retrial based on the errors in the jury instructions, we need not address whether the motion for a new trial should have been granted. The status and relevance of the proposed new rule may or may not be an issue in the proceedings on remand.

Accordingly, for the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.