In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2544

BARBARA J. SUAREZ and WILLIAM G. SUAREZ,

*Plaintiffs-Appellants,*

*v.*

TOWN OF OGDEN DUNES, INDIANA;
OFFICERS ROBERT TROWBRIDGE,
HAROLD MCCORKEL, KEVIN HUGHES,
KEN TOMASKO, WILLIAM SMITH, and
JOSEPH RADIC,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:05-cv-225-APR—**Andrew P. Rodovich**, *Magistrate Judge.*

ARGUED FEBRUARY 25, 2009—DECIDED SEPTEMBER 11, 2009

Before FLAUM, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A nasty confrontation between various law enforcement officials and Barbara Suarez and her son William resulted in the Suarezes' arrest. The officers entered the Suarez home late at night with a

search warrant they had obtained based on evidence that an underage drinking party was taking place at the house. Barbara was charged with contributing to the delinquency of a juvenile and William was charged with consumption by a minor, resisting arrest, and battery of a law enforcement officer. William pleaded guilty to the consumption and battery charges; the charges against Barbara were dropped.

After the termination of their criminal proceedings, the Suarezes filed a § 1983 action against a multitude of defendants. *See* 42 U.S.C. § 1983. The Suarezes' claims fell into two basic types. First, they alleged that the search of their house and their arrests violated the Fourth Amendment. Second, William alleged that the police used unnecessary force when they arrested him. All of the defendants were awarded summary judgment on the Fourth Amendment claims. Most defendants were similarly granted summary judgment on the excessive force claim, except for officers Tomasko, Smith, and Radic, who prevailed at a jury trial. The Suarezes appeal the denial of summary judgment on the illegal search and arrest claims and raise an evidentiary issue arising from the excessive force trial. They limit their appeal to their claims against the town of Ogden Dunes and six individual officers from the variety of law enforcement entities responsible for the Indiana Dunes environs.

## I.  Background

On the night of his high school graduation in June 2003, William Suarez had a party at his parents' house in Ogden

Dunes, Indiana. The party was apparently typical for the area: a group of teenagers gathered around a bonfire, drinking beer on the beach behind the Suarez home. At 11:00 p.m. Robert Trowbridge of the Ogden Dunes Police Department pulled up in front of the Suarez home to ticket one of the kids, Gerald Bardeson, for parking on the road with an invalid permit. After speaking with Bardeson, Trowbridge let him off without a ticket (despite noticing alcohol on Bardeson's breath) and noted that there appeared to be underage drinking taking place at the home. While he talked with Bardeson, he was verbally abused by the partygoers.

Trowbridge pulled to the end of the road and as he stopped there, several youths jumped on the trunk of his car. He believed that these youths were from the Suarez party, but there was at least one other party involving teenagers taking place on the beach that night. He drove by the house once more and was subjected to more verbal abuse. After leaving the house, Trowbridge believed he needed assistance dealing with the party and went to round up police reinforcements.

Bardeson, meanwhile, left for home after he spoke with Trowbridge. He felt the party was getting out of control and that everyone was going to end up in jail. Bardeson wasn't able to avoid the long arm of the Ogden Dunes law, however; Officer Trowbridge and his reinforcements descended on him after he parked at a tennis court across the street from his house. There, after Bardeson allegedly resisted arrest, he was pepper-sprayed, handcuffed, and possibly set upon by a K-9. Bardeson

was trundled off to jail but his part in our story ends there. He pleaded guilty to a charge of being a minor consuming alcohol in order to put the whole incident behind him.

As Trowbridge and his reinforcements were rounding up Bardeson, William Suarez was wrapping up the party. He went outside, told everyone who was leaving to take off, put out the bonfire, and invited nine of his friends to stay the night. The town had a beach curfew of midnight, so this was when parties usually ended. But, Barbara Suarez also had a bad feeling that Trowbridge would be back to cause trouble, so she had the kids come upstairs to sleep in her room (she was also concerned about their continued access to alcohol, which she alleges she discovered they were drinking *after* the party broke up).

After arresting Bardeson, Trowbridge returned to the Suarez house with at least eight to ten squad cars. (It must have been a slow night for law enforcement in the Ogden Dunes area.) When the police arrived at 11:53 p.m., there were no kids in the street or the yard but there were still multiple cars parked around the residence. Some of these cars were in the driveway, which held up to six cars. Others had valid temporary parking passes and were parked on the road in front of the house. Believing that the party was continuing in the house, Trowbridge called a local judge for a search warrant.

The judge heard the following facts in Trowbridge's application for the warrant: Trowbridge reported that he "came across a whole bunch of kids" standing in the

driveway of the Suarez home when he was issuing a ticket for an illegally parked car. After deciding not to issue the ticket, he was turning around to leave when "a few of the kids approached the squad car and jumped on the roof and got up on the trunk of the car." The kids "come [sic] back three more times and jumped on the car and the hood again." He testified that when he went to chastise the kids, there was a group "screaming and yelling and laughing in the driveway" and he decided to go get backup. After backup arrived, "we found three bottles, containers of (unintelligible)[1] around the house. All the kids retreated into the home." Responding to the judge's question, Trowbridge testified that the bottles "were laying in the backyard," that the children "looked anywhere from sixteen to twenty," and he believed they had been consuming alcohol. He finally testified that he sought a warrant to go into the home and "determine the facts" and that "we shown [sic] the light through the window and could see kids hiding behind the couches." The judge issued a warrant authorizing entry into the Suarez home to search the premises.

At approximately 12:30 a.m., after the police knocked on the door (and possibly called the house) a disputed number of times, they broke down the door with a ramrod and arrested Barbara and William (after wrestling him out of the attic and pepper-spraying him). They

[1] It's unfortunate that this word is unintelligible, but it's clear from the context and the parties' deposition testimony that the word is "beer." The Suarezes do not dispute this.

breathalyzed the other boys at the house, arresting those who tested positive for alcohol.

After the disposition of their criminal cases, the Suarezes sued pursuant to 42 U.S.C. § 1983, alleging that their Fourth Amendment rights were violated by the search and subsequent arrests, because neither was supported by probable cause. William Suarez also alleged that the police had used excessive force in his arrest. The case was assigned by the parties' consent to a magistrate judge, who granted summary judgment for the defendants on the issue of probable cause and summary judgment to certain other officers on the excessive force claim. William Suarez's case against three officers proceeded to trial on the issue of police brutality, where the defendants prevailed. We now take up the Suarezes' appeal.

## II. Analysis

### A. Was there probable cause for the search of the Suarez home?[2]

We review a grant of summary judgment de novo, drawing all inferences in favor of the non-moving party.

---

[2] Defendants argue that the plaintiffs are estopped from relitigating the probable cause issue because the matter was decided in a state suppression proceeding. *Whitley v. Seibel*, 676 F.2d 245, 248 (7th Cir. 1982). We are not so sure. *See Best v. City of Portland*, 554 F.3d 698, 699 (7th Cir. 2009). In any event, we need not decide the viability of this defense because the plaintiffs' argument fails on the merits.

*Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007). Summary judgment is only appropriate when "the evidence in the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)).

The Suarezes' illegal search claim depends on whether the police had probable cause to support a search of the Suarez home. Probable cause exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that . . . evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Lowe*, 516 F.3d 580, 585 (7th Cir. 2008). Probable cause deals with beliefs, not certainties. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). It is a "fluid concept" that depends on the context in which it is being assessed. *Ornelas*, 517 U.S. at 696. Probable cause is a matter of common sense, based on the "factual and practical considerations of everyday life." *Id.* at 695. "In making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003); *see also Groh v. Ramirez*, 540 U.S. 551, 575 (2004) (Thomas, J., dissenting) ("The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (alteration in

the original) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948))). "Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

The Suarezes do not contend that the judge Officer Trowbridge spoke to should not have issued a search warrant for their home. Instead, they challenge the veracity of the statements Trowbridge made in supporting his request for the warrant. This is tough sledding. The affidavit (in this case, the sworn telephonic testimony) supporting a search warrant carries with it a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 165, 171 (1978); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). To survive summary judgment the plaintiffs must "provide evidence that the officers knowingly or intentionally or with a reckless disregard for the truth made false statements to the judicial officer" and show that "the false statements were necessary to the judicial officer['s] determination[] that probable cause existed." *Molina*, 325 F.3d at 968 (quotation omitted). The same standard applies to any alleged omissions in the warrant. *Id.* "Immaterial" misstatements or omissions do not invalidate the warrant. *Id.*

The plaintiffs' theory of the case rests in large part on the personal animus that they allege existed between Trowbridge and themselves—an animus that, they argue, had resulted in a feud that culminated in their arrest. They argue that Trowbridge lied when he told

the judge that kids could be seen hiding behind furniture. He also misled the judge, they claim, by implying that he had seen kids retreat into the house, when in reality he had returned to find all the kids gone. They say that Trowbridge specifically skipped over the timing issues that made the probable cause determination in this case difficult; his statement to the magistrate implies that he had essentially seen the kids go into the house while waiting for his backup.

The question is whether any statement or omission that the Suarezes challenge was intentionally or recklessly false, and whether it was material to the issuance of the warrant. Their allegations can be grouped into two basic categories. The first group concerns the timing of the warrant. The second concerns misrepresentations regarding the physical evidence at the scene. Neither category of evidence the Suarezes offer is sufficient to overturn the affidavit's presumption of validity.

The first category of disputed evidence includes the Suarezes' allegations that Officer Trowbridge omitted the timing between the events with the kids in the Suarez driveway and the time the officers returned to find the house dark. They further argue that his formulation that "[a]ll the kids retreated into the home" misleadingly implied that Officer Trowbridge saw the kids go into the home. They also argue that Offcer Trowbridge neglected to mention that Gerry Bardeson, to whom Trowbridge had referred to specifically throughout his application for the warrant, had already been arrested by the time the police sought the warrant, and

that he was the only known minor drinking at the house. The Suarezes argue that Trowbridge's combination of omissions and misrepresentations elided the gap in time that made it impossible to connect anything taking place outside the Suarez home at 11:00 p.m. with what was taking place in the home at 11:53 p.m.

However, the undisputed facts indicate that none of Trowbridge's statements or omissions was materially false. First, it is undisputed that there were several cars still parked around the Suarez home, both in the street and in the driveway; the presence of these cars and the fact that no one was in the street, outside the house or behind the house on the beach, provided ample basis for Trowbridge's claims that the teenagers "retreated into the house." This was therefore not a misrepresentation. Second, a gap of fifty-three minutes between observing the rowdy behavior of the youths and a decision to enter into the home does not sever the connection between the illegal behavior that Trowbridge witnessed and a belief that illegal activity was occurring in the home, or that evidence of the illegal activity would be found there, particularly since the parked cars gave rise to an inference that a gathering was still taking place. The omission of the timing therefore was not material to the determination of probable cause. Finally, had Trowbridge specifically mentioned Bardeson's arrest, it would only have bolstered his claim that there was underage drinking taking place at the Suarez residence, since Bardeson was arrested for consuming alcohol and he had just left the residence. Failure to mention this fact was, again, not material to the probable cause determination.

The second class of the Suarezes' claims attack the specific evidence that Trowbridge referred to in the warrant application. The Suarezes argue that only one officer—not Trowbridge—actually claimed to have seen someone hiding in the house. Trowbridge, they also note, testified during a deposition in the civil case that he did not personally see bottles around the house. They complain that the kids who jumped on Trowbridge's car could not be positively traced to the gathering at the Suarez home. And they argue no plastic cups, beer bottles, or other alcoholic beverages were photographed outside the residence.

But the Suarezes are nit-picking. It is true that according to some of their witnesses, there was at least one other party taking place on the beach that night, but Trowbridge's car was leapt on shortly after he had been hassled specifically by kids at the Suarez home. This allowed him to draw an extremely reasonable inference that unruly kids were present at the home he wished to search. Similarly, while it is true that Trowbridge personally did not find beer bottles, he swore in his application for the warrant that other officers found the bottles and reported it to him. He made the same statement regarding the teenagers hiding in the house, a statement that is backed up by another officer on the scene, Park Ranger Chorba. Officer Trowbridge was entitled to rely on the collective knowledge of all the investigating officers in making out his warrant request. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005).

The Suarezes say that Chorba was lying, and that all the kids were upstairs in the house. Given that William

admitted in his deposition to looking out of the house and seeing the cops assembling, both sides' versions of the facts are easy to reconcile and we think that this was probably not a misrepresentation. The Suarezes had been tipped off by a neighbor that a phalanx of squad cars was lining up down the street, which explains William's furtive glances at the action taking place outside his house. Furthermore, even if Chorba's statement was incorrect, the plaintiffs must show that Trowbridge's reliance on it was a reckless misrepresentation; they cannot. Finally, even if there were a genuine dispute over what Chorba actually saw, we do not think it a material one; the validity of the warrant did not hinge on the officers' ability to spot kids in the house. Given the presence of the cars outside the home, the teenagers' presence within, as noted, was a reasonable inference for the officers to make.

Regarding whether or not cups or bottles were tagged into evidence, the Suarezes cannot seriously argue that the officers' reference to any of the aforementioned evidence was a misrepresentation. Given that other officers supported the assertion that bottles were outside the home and that both parties' witnesses testified at deposition that there were coolers of beer at the party, the Suarezes fall far short of establishing that Trowbridge lied when he testified that the bottles were seen in the backyard. More broadly, despite the quibbles that the Suarezes have with Officer Trowbridge's warrant request, they cannot contest that the facts on the ground were much as he described them to the magistrate. Accordingly, they fall short of establishing the intentional or

reckless misrepresentations or omissions that the *Franks* standard requires. The grant of summary judgment in the defendants' favor was, therefore, appropriate.

### B. Legality of the Suarezes' Arrests

The Suarezes next argue that their arrests were illegal because the police did not have probable cause to be in their home. Because we find that probable cause for the search warrant existed, this argument necessarily fails. This disposes of William's claim. Barbara Suarez also hints that probable cause did not exist to arrest her, even if it did exist to enter the home, because there was no evidence that she supplied the alcohol or encouraged anyone to drink. But, as the Indiana Court of Appeals has held, a homeowner's decision to permit minors to consume alcohol in her home is sufficient to violate Indiana's contributing to the delinquency of a minor statute. IND. CODE 35-46-1-8 (penalizing an adult who "knowingly or intentionally encourages, aids, induces, or causes a person less than 18 years of age to commit an act of delinquency"); *Rush v. Indiana*, 881 N.E.2d 46, 54 (Ind. Ct. App. 2008). Given that the police had reason to believe, as we've discussed, that minors were consuming alcohol at the Suarez home, and that Barbara Suarez was on the premises, surrounded by teenagers who were breathalyzed and arrested, and had not responded to the officers' request for entry, the undisputed facts show that there was probable cause for her arrest.

### C. Admissibility of Evidence

William Suarez also challenges the trial court's refusal to admit portions of an audiotape of police activity that night; he wanted to use the portions of the tape to show that the officers on trial were insistent on getting and executing a warrant. These recordings, William argues, would impeach the officers' contention at trial that they did not have an integral role in the decision to search the Suarez home. We review a judge's decision to exclude evidence for an abuse of discretion. *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009). We will find error only where "no reasonable person could take the view adopted by the trial court." *Id.* (quotation omitted).

The recording William sought to admit was captured by a microphone worn by Trowbridge. The microphone recorded conversations beginning with the decision to seek a warrant to search the Suarez home. The trial judge admitted the recording beginning with the entry into the Suarez home but excluded the earlier portion that contained the officers' discussion of whether to execute the warrant.

The judge excluded the earlier conversations because he found that their relevance was outweighed by the confusion of issues that the evidence's admission would engender. *See* FED. R. EVID. 403. The sole issue at trial was whether the police officers used excessive force after they had entered the house and arrested William Suarez. The issue was not whether the officers had probable cause to enter the house. We find it reason-

able for the judge to believe that evidence of the steps taken to secure the warrant would confuse the jury on the force issue. Thus, there was no abuse of discretion.

### III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.